## WALTER FRANKLIN GOVER, JR. *v.*
## STATE OF MARYLAND

[No. 340, September Term, 1971.]

*Decided April 19, 1972.*

The cause was argued before MURPHY, C. J., and MORTON and MOYLAN, JJ.

*Edward C. Covahey, Jr.,* with whom was *William F. C. Marlow, Jr.,* on the brief, for appellant.

*Arrie W. Davis, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Samuel A. Green, Jr., State's Attorney for Baltimore County,* and *Stuart E. Hirsch, Assistant State's Attorney for Baltimore County,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

The subtle but vital difference between a general criminal intent and a specific criminal intent has long intrigued academicians and has long perplexed practitioners. Upon that difference hinges the validity of the conviction of the appellant, Walter Franklin Gover, Jr., in the Circuit Court for Baltimore County by Judge John E. Raine, Jr., sitting without a jury, of armed robbery.

The robbery was bizarre. It occurred at a Seven-Eleven Store in Texas, Maryland, at about 9:30 p.m. on November 12, 1970. The appellant himself testified that he had been drunk the night before, November 11th, and that when he awoke at about 6 a.m. on the morning of November 12th, he started drinking whiskey again. His memory of November 12th was a surrealistic haze. He remembered vaguely being in a bar with one John Baron and at another time being on a church parking lot. He knew that he had had nothing to eat on the day of November 12th but that he had consumed "eight bennies." He recalled waking up in jail on the evening of November 13, 1970.

John Baron, a close friend, testified that he and the appellant started drinking whiskey at 9:30 a.m. on November 12th and that the appellant continued to drink whiskey and beer "heavily" until about 6:30 p.m. At that point, John Baron drove the appellant to Church Lane, where he dropped him off. He testified that the appellant was intoxicated to the extent that he could not walk and that he was "very drunk."

Bennett Baron, the appellant's brother-in-law, testified that he saw the appellant in front of a tavern at 9:30 on the morning of November 12th, at which time the appellant offered Baron a drink from a bottle in his pocket. Bennett Baron stated that the appellant appeared "high" and that he appeared to be "high on drugs."

Dale Tutor, an employee of the Seven-Eleven Store which was held up, testified that he approached the store at about 9:30 p.m. on November 12th and observed the

appellant on the parking lot adjacent to the store. Tutor had known the appellant for a year and a half. The appellant produced a pistol, indicated that he needed $35, announced his intention of holding up the Seven-Eleven Store, and told Tutor that he should "Beat it." Tutor testified that the appellant, a frequent visitor to the store, "didn't seem himself at the time." Tutor had on a number of prior occasions seen the appellant "loaded" and had seen him staggering up Church Lane in the morning. He testified that he was in no fear of the appellant. Tutor attempted to dissuade the appellant from the contemplated robbery, explaining to him that he could not succeed since he was well known both to Tutor and to another clerk of the store, William Gillespie. Notwithstanding that advice, the appellant entered the store with Tutor and continued in conversation with him for approximately twenty minutes, while other customers were entering and leaving the store. At one point during that conversation, Tutor told the appellant that he was "nuts for doing it." This noticeably disturbed the appellant who then reproduced the pistol and ordered Tutor behind the counter to get the money. Tutor complied, turning over some $150 in currency and three packs of cigarettes. The appellant then left the store.

William Gillespie, the clerk on duty on November 12th, testified that he was present when the appellant engaged in conversation with Tutor for about fifteen minutes. He stated that he had known the appellant for approximately six or seven years and that the appellant was a frequent visitor to the store. He testified that the appellant was "drunk half of the time" and that on November 12th he was "acting strange and was sort of glossy-eyed." He testified as to the *corpus delicti* of the robbery and the departure of the appellant.

Bearing upon the appellant's state of mind, Judge Raine made the following findings of fact:

> "I don't have any doubts that Gover was drunk that he wasn't acting rationally because,

number one, I don't even think Gover is so stupid that he could think that he's going to get away with robbing a place when he's so well known by the people that he's robbing. Here he's standing there, and everybody knows him, everybody sees him, he has no mask. He might know that the minute he walks out they're going to call the police and say not we were robbed but that Buddy Gover who lives on Church Lane has just robbed us. Nobody in his right mind would have done what Gover did, so, I am persuaded, you have made your point through Baron and the other witnesses, I think the defendant was so drunk as to be acting irrationally and it may have come from whiskey or it might have come from pills or a combination, but, I am completely convinced that his own physical and mental condition was voluntarily brought about by his excessive use of alcohol and/or drugs. It's not a defense to the charge and I don't believe that you can cite me a Maryland case involving robbery that so holds and I think that you've got to carefully distinguish the other cases, such as *Bateman;* I don't believe that *Bateman* applies here. That's why I asked you during your argument what the charge was in *Bateman.* If you kill a man and you're so drunk as to not know what you're doing you can get off on a first degree murder charge but you can be convicted of manslaughter even though you didn't intend to pull the trigger at all because you're drunk you didn't even know you had the gun."

Judge Raine was correct in his legal conclusion that voluntary drunkenness is ordinarily no defense to a crime. That general proposition of law deals with crimes where the mental element is one of general criminal intent, the intention of doing the *actus reus* itself. A limitation on that general proposition, however, is that where a crime

has as one of its elements the additional *mens rea* of some specific intent above and beyond the doing of the *actus reus*, even voluntary intoxication may negate the presence of that "specific intent." As Judge Thompson said for this Court in *Frank v. State,* 6 Md. App. 332, at 334:

> "It is universally recognized that voluntary drunkenness is generally not a defense to crime, see *Michael v. State,* 1 Md. App. 243, 247, 229 A. 2d 145 wherein we collected the various authorities. Although the older law made no exceptions it is now equally well settled that where a crime requires a specific intent, motive, or purpose, voluntary drunkenness may be considered in determining whether or not the accused lacked the mental capacity to commit the crime, see *Avey v. State,* 249 Md. 385, 240 A. 2d 107; *Mock v. State,* 2 Md. App. 771, 237 A. 2d 811; *Dubs v. State,* 2 Md. App. 524, 235 A. 2d 764; *Michael v. State, supra.*"

The trial judge here correctly focused the issue as to whether armed robbery has as one of its elements a specific intent or a mere general intent, but after correctly focusing upon the issue resolved it, we feel, erroneously:

> "The Court is familiar with the cases like *Bateman v. State* in 10 Md. App. where you are dealing with a homicide charge and where there is a homicide it is presumed to be second degree murder and before the State can raise the homicide to first degree murder the State must establish the defendant's state of mind. It must be a deliberate and premeditated action with malice aforethought, things of that kind. There are other crimes such as assault with intent to kill that the Court has said that drunkenness might negative the finding of intent but there are al-

> so many crimes where the mental condition of the defendant does not excuse him because a person is ordinarily said to intend doing what he in fact does, and voluntary drunkenness is not accepted as a defense. Now, I think you could say generally that every crime involves an intent, a mens rea, but, nevertheless, there are certain crimes where the drunkenness destroys any mental capacity. I don't believe that an individual can pick up a gun and go in and point it at a 7-Eleven clerk, or a bank teller, or a gas station attendant, and say, give me your money, at gun point, and then be heard to say later, well, I got so drunk I didn't know or intend to do what I did."

Robbery embraces as one of its elements larceny and thereby subsumes all of the elements of larceny, one of which is an *animus furandi* or a specific intent to deprive the owner permanently of his property. As we said in *Wiggins v. State,* 8 Md. App. 598, at 604:

> "Another element of larceny is the larcenous intent; so every robbery embraces a larcenous intent. This means that every robber must intend to steal the property taken. The crucial ingredient of larcenous intent is that the intent be to deprive the owner (within the applicable definition of that term, see *Kyle v. State,* 6 Md. App. 159, *Frazier v. State,* 5 Md. App. 88) permanently of his property."

See also *Clarke v. State,* 3 Md. App. 447, 453.

From a full reading of the findings of the trial judge, it is clear that he believed that this appellant suffered from a significant degree of intoxication but concluded that that intoxication was voluntarily induced. It also seems apparent that the trial judge made the finding that the appellant possessed at least that minimal understanding requisite for a general criminal intent, an aware-

ness of doing the *actus reus* itself. It also seems clear that the trial judge concluded that this was the only *mens rea* necessary for the State to prove. We hold that he was in error in not applying the stricter *mens rea* standard of a "specific intent" permanently to deprive the owner of the goods being converted, which more specific intent even voluntary intoxication might well have been held to have negated.

> *Judgment reversed; case remanded for a new trial.*