468 A.2d 669

**Richard James BIGGS**

v.

**STATE of Maryland.**

**No. 253, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

Dec. 14, 1983.

Mark Colvin, Assigned Public Defender, with whom was Alan H. Murrell, Public Defender of Md., on the brief, for appellant.

Jillyn K. Schulze, Asst. Atty. Gen., with whom were Stephen H. Sachs, Atty. Gen., Andrew L. Sonner, State's Atty., for Montgomery County and Eric Wright, Asst. State's Atty., for Montgomery County on the brief, for appellee.

Submitted before ADKINS, BLOOM and BELL, JJ.

BLOOM, Judge.

On November 24, 1981, at approximately 8:30 p.m., Richard Burlingame was shot and seriously injured. He identified appellant, Richard James Biggs, as his assailant. The shooting took place outside the Psyche Delly Restaurant in Bethesda. Burlingame arrived at the restaurant at approximately 7:00 p.m. Shortly thereafter, his friend Warren Jenkins arrived. The two of them sat together, drank some beer, and discussed their respective jobs. Burlingame and Jenkins both testified that between forty-five minutes and an hour later, at approximately 8:00 p.m., appellant came into the restaurant and joined them. Eventually the conversation turned to an incident that had occurred a few years earlier when Burlingame, during the course of general horseplay, pushed appellant through a greenhouse window, causing substantial injury to appellant.

During the course of their conversation, both Burlingame and appellant raised their voices and appeared to become angry with each other, but after a short period of time the dispute cooled down. Appellant then asked Burlingame to step outside so that they could talk, and Burlingame complied with that request. Burlingame testified that when they stepped outside, appellant began shouting and calling Burlingame a liar. As Burlingame turned to go back inside, he heard gunshots and felt a sharp pain in his lower back. He turned around and saw appellant standing close by with a .32 caliber pistol in his hand. Appellant ran toward a parking lot and Burlingame re-entered the bar. The police and rescue squad were called, and Burlingame was taken to Suburban Hospital.

Appellant contended that he was not present at the Psyche Delly on the night of the shooting. Instead, he alleges, he was attending an adult education class in electrical wiring at Montgomery Blair High School. The course instructor testified that the class met from 6:00 p.m. until 9:00 p.m. on that evening and that appellant's name appeared on the attendance sheet for that class. Furthermore,

the instructor testified that he called the roll before the class break at 7:30 p.m. and that his records reveal that a response was given to appellant's name. The instructor, however, had no independent recollection of appellant being present in class. A co-worker of appellant who was also a student in that class testified that he remembered seeing appellant at the beginning of the class period that evening but could not remember seeing appellant after the 7:30 break.

Appellant was charged with the shooting and was tried by a jury in the Circuit Court for Montgomery County. He was acquitted of assault with intent to murder but convicted of assault with intent to maim and use of a handgun in the commission of a crime of violence.

Appellant's first argument is that the trial court erred in excluding evidence pertaining to the victim's bias against him. When cross-examined on the subject, Burlingame denied making accusations against appellant in the past. Specifically, Burlingame denied that he had ever accused appellant of sleeping with Burlingame's wife. He also denied that he had ever accused appellant of telling the police that Burlingame was a drug dealer.

During his case in chief, appellant was questioned by his counsel concerning the alleged accusations.

Q. Mr. Biggs, you were here yesterday when Mr. Burlingame testified that you shot him.

A. Yes, I was.

Q. Has he accused you of things in the past?

MR. WRIGHT [Assistant State's Attorney]: Objection.

THE COURT: Objection sustained.

BY MR. GILL [Appellant's trial counsel]:

Q. Mr. Burlingame testified you and he were friends. Were you friends at one time?

A. At one time we were.

Q. Did certain events happen that changed that situation?

A. Yes, quite a few.

Q. Can you explain to the jury over the years what's happened exactly what he has said and what happened?

A. Well, yes, I can. I remember he got out of the military in '71, '72. And he was different. You know, he was into a lot of drugs.

MR. WRIGHT: Now, Your Honor, I do object. The question was, what has Mr. Burlingame said or done to cause the rupture of their friendship. I don't understand how that answer has anything to do with the question. I move to strike the answer.

THE COURT: Well, we can go ahead with it, Mr. Gill, but just answer the question, Mr. Biggs.

BY MR. GILL:

Q. Was there a time that Mr. Burlingame complained to you about his wife?

A. He accused me of being involved with her.

Q. When was that?

A. '72 when they were separated.

Q. Were you involved with her?

A. No, I wasn't.

Q. How many times did he accuse you of being involved with her?

MR. WRIGHT: Your Honor, I do object on grounds of relevance.

THE COURT: I don't think this has any relevancy with this matter. As far as criminal charges against him or things of that nature, you can certainly bring that out.

BY MR. GILL:

Q. All right. Mr. Biggs, did there come a time you lived with Mr. Burlingame?

A. We had a house over on Northbrook Lane in '75.

Q. How long did you live together at that Northbrook Lane address?

A. Just a few months.

Q. Was there a particular reason you left?

A. Yes.

Q. Why?

A. He was heavily involved in dealing with drugs.

MR. WRIGHT: Your Honor, I object. It's irrelevant.

THE COURT: That has nothing to do with this case, Mr. Gill.

MR. GILL: I think it's going to, Your Honor.

THE COURT: Well it's not at this point 'cause I'm not going to let him tell us about it.

BY MR. GILL:

Q. Okay. After you left, did you have conversations with Mr. Burlingame?

A. Yes, I did.

Q. Did he accuse you of something?

A. Yes, he did.

MR. WRIGHT: I object. I don't mind the answer "Yes" or "No," but I do object.

THE COURT: Okay. I'm not going to get into that. If he filed all those criminal charges against him, things of that nature, certainly bring that out.

MR. GILL: This is very much akin to that, Your Honor.

THE COURT: Well, if it's a criminal charge, fine. If it's not, then forget it.

MR. GILL: Could I make a proffer at the bench?

THE COURT: I don't need a proffer about it, Mr. Gill. I told you what I think you can do with it.

 While a witness generally may be cross-examined on any matter concerning his or her credibility,[1] the use of extrinsic evidence to impeach a witness is subject to greater restriction. Extrinsic evidence may not be used to impeach a witness on a solely collateral or irrelevant matter. *Smith v. State,* 273 Md. 152, 157, 328 A.2d 274 (1974). Matters which affect the interest, bias, hostility, or motives of a

---

1. *See, e.g., Cox v. State,* 51 Md.App. 271, 443 A.2d 607 (1982) (opinion by Orth, J.; dissenting opinion by Lowe, J.; and concurring opinion by Wilner, J.) (cert. granted), and *cf. Reese v. State,* 54 Md.App. 281, 458 A.2d 492 (1983) (opinion by Lowe, J.). As those cases indicate, wide latitude must be afforded the cross-examiner as a matter of Sixth Amendment right.

witness, however, are always relevant; and, therefore, extrinsic evidence is admissible in order to impeach a witness on these grounds. *See Robinson v. State,* 47 Md.App. 558, 572, 425 A.2d 211 (1981); *United States v. Frankenthal,* 582 F.2d 1102, 1106 (7th Cir.1978); McCormick, *The Law of Evidence,* § 40 (2d ed. 1972).

While evidence of a witness' bias is perfectly competent to indicate that the witness has a strong motivation to lie, "it must be rigorously guarded against that a witness be diminished in the eyes of a jury simply by a showing that he is 'a bad man.'" *Godwin v. State,* 38 Md.App. 716, 728, 382 A.2d 596 (1978).[2] It is important for the trial judge to distinguish an attack upon a witness' general credit (evidence of specific bad acts, inadmissible) from an attack upon a witness' credit in the particular case (evidence of an interest in the litigation or bias against a party, admissible). 3A Wigmore, *Evidence* § 943 (Chadbourn rev. 1970) quoting *McHugh v. State,* 31 Ala. 317, 320 (1858).

Here, it appears that appellant was trying to bring out specific bad acts of Burlingame under the guise of showing bias on his part. In answering a question dealing with what had happened to his relationship with Burlingame, appellant said, "He was into a lot of drugs." Later, in answering why he had stopped living with Burlingame, appellant stated, "He was heavily involved in dealing with drugs."

In determining the extent to which independent evidence will be allowed to establish a witness' hostility, the trial judge is obligated to exercise his sound discretion. *United States v. Harvey,* 547 F.2d 720, 723 (2d Cir.1976). "In any case, however, no more of the facts and circumstances should be admitted than are necessary to give a fairly intelligent understanding of the cause, nature, and extent of the ill feeling." 81 Am.Jur.2d *Witnesses* § 549

---

2. Vacated, *Godwin v. State,* 284 Md. 85, 403 A.2d 785 (1978), on other grounds, as a result of *State v. Frye,* 283 Md. 709, 393 A.2d 1372 (1978).

(1976) (footnote omitted). Here, by virtue of the pattern of questioning by appellant's counsel and the nature of the answers of appellant, the trial judge apparently perceived that appellant was attempting to discredit Burlingame by revealing to the jury specific bad acts of Burlingame.

This concern of the trial judge is further supported by the staleness of the circumstances which give rise to the purported hostility of Burlingame toward appellant. Although no proffer was allowed to be made at trial, appellant included a proffer in his motion for a new trial. From that proffer, along with appellant's brief and the trial transcript, we have ascertained that the two accusations made by Burlingame, which supposedly show that Burlingame is currently biased against appellant, were made in 1972 and 1975 respectively.

> The fact that the hostility arose a considerable period prior to the date of the trial would appear to be no reason for the exclusion of the evidence if the hostility and prejudice had continued. But it would seem to be necessary to make it appear either that the hostility exists at the time of trial, or that it arose so recently that it can be assumed to continue.

81 Am.Jur.2d, *supra* (footnote omitted); *see also,* 98 C.J.S., *Witnesses* § 557 (1957).

■ Appellant's proffer does not allege the existence of recent circumstances which would indicate that Burlingame is prejudiced against appellant. Nor does the proffer contain any showing that the incidents of eight and ten years ago continue to cause Burlingame to be hostile toward appellant. "The hostility with which the law is concerned is that as of the time the witness is testifying." *Eye v. Kafer, Inc.,* 202 Cal.App.2d 449, 457, 20 Cal.Rptr. 841, 846 (1962). Here, appellant only shows that, at most, Burlingame was biased against appellant eight years ago. Since there is no showing that such bias continued and existed at the time of Burlingame's testimony, the trial judge did not err in excluding the evidence.

■ Appellant's second argument is that the trial court erred in refusing to instruct the jury that voluntary intoxication can be a defense to the offense of use of a handgun in the commission of a crime of violence. When a defendant is charged with a crime which requires a specific intent, the defendant's voluntary intoxication will serve as a defense if he was so drunk that he was unable to formulate the necessary *mens rea*. *State v. Gover,* 267 Md. 602, 606, 298 A.2d 378 (1973). Thus, if a defendant is charged with a specific intent crime and there is evidence that he was intoxicated at the time of its commission, he is entitled to a jury instruction that his intoxication may serve as a defense.

In this case, there was some evidence that appellant was intoxicated at the time of the shooting. Accordingly, the trial judge instructed the jury that if they found appellant to have been so intoxicated as to have rendered him incapable of forming the necessary specific intent, then he must be found not guilty of assault with intent to murder and assault with intent to maim. The trial judge did not give such an instruction with respect to the handgun charge. The issue presented to us is whether the use of a handgun in the commission of a crime of violence is a specific intent crime. We hold that it is not.

Md.Ann.Code art. 27, § 36B(d) provides that "[a]ny person who shall use a handgun in the commission of any felony or any crime of violence as defined in § 441 of this article, shall be guilty of a separate misdemeanor. . . ." The section requires the State to prove two elements: (1) that a felony or crime of violence was committed; and (2) that a handgun was employed in its perpetration. *Coates v. Maryland,* 436 F.Supp. 226, 232 (D.Md.1977). Neither of these elements require the defendant to entertain any specific intent.

■ It is important to remember that the handgun offense "is separate and distinct from the felony or crime of violence during the commission of which the handgun was used." *Ford v. State,* 274 Md. 546, 551, 337 A.2d 81 (1975). While the underlying crime may indeed be a specific intent

crime, as it is here, that fact does not transform the *separate* handgun offense into a specific intent crime. Indeed, it is possible for the underlying crime to be one that does not require a specific intent, *e.g.,* rape or second degree murder. In prosecuting a handgun charge, the State need not prove that the defendant used a handgun with the specific intent that its use be in the commission of a felony or crime of violence. Rather, the State is only required to prove that the defendant intended to use a handgun in what was, in fact and in law, a felony or a crime of violence. In short, the required *mens rea* is merely that the defendant intended to do the forbidden act, i.e., that he intended to use a handgun in the commission of the crime he committed. If that crime turned out to be a felony or a crime of violence, the elements of the handgun violation are fully established. The distinction is between a general intent crime and a specific intent one.

█ Since the State must prove "beyond a reasonable doubt, from the evidence, that the accused used a handgun during the commission of either a felony or a crime of violence as a prerequisite to being convicted of unlawfully using a handgun in the commission of either," *id.* at 550–551, 337 A.2d 81 (footnote omitted), all of the elements of the underlying crime must be proved. When, as in this case, a specific intent crime is the underlying crime, evidence of the defendant's voluntary intoxication may produce a domino effect, i.e., the intoxication may negate the necessary specific intent of the underlying crime, without proof of which the State will have failed to prove the handgun charge. Thus, if a defendant is charged only with a handgun offense and the State relies on a specific intent crime as the underlying felony or crime of violence, then the defendant would be entitled to an instruction concerning the effect of intoxication on the specific intent offense. But where, as here, the accused is charged with the underlying specific intent crime as well as the handgun offense and is granted an instruction concerning the effect of intoxication as it relates to the specific offense crime, he is not entitled to a separate,

additional instruction that intoxication may be a defense to the handgun offense.

Moreover, in convicting appellant of assault with intent to maim, the jury had to find that he was not so intoxicated as to lack capacity to form a specific intent.

■ Appellant's third argument is that the trial court erred in accepting the jury's verdict without first allowing one of the jurors to ask a question. During the polling of the jury the following dialogue occurred:

CLERK: Michael Manders, is the forelady's verdict your verdict?

MR. MANDERS: Can we ask a question before we answer?

THE COURT: No, you just answer.

MR. MANDERS: Yes, it is.

Appellant contends that Mr. Manders' response to the clerk's inquiry does not "clearly indicate" his assent to the verdict. *See Heinze v. State,* 184 Md. 613, 620, 42 A.2d 128 (1945). Rather, appellant states in his brief that Mr. Manders' response "demonstrates uncertainty on his part and raises substantial doubt as to the unanimity of the verdict." Appellant then suggests that "the trial judge should have inquired of Mr. Manders, as requested by Appellant, to determine whether Mr. Manders truly assented to the announced verdict."

Maryland Rule 759 e directs that

[u]pon the request of a party or upon the court's own motion, the jury shall be polled after it has returned a verdict and before the jury is discharged. If upon the poll the jury do not unanimously concur in the verdict, the court may direct the jury to retire for further deliberation or may discharge the jury.

Viewing the dictates of the rule against the factual background of the jury polling, the issue becomes: Did Mr. Manders' request to ask a question indicate that the jury did not unanimously concur in the verdict? We think not.

Appellant relies on several cases from other jurisdictions to support his position. In *United States v. McCoy,* 429 F.2d 739 (D.C.Cir.1970), a juror was asked whether his verdict was the same as the one given by the foreman. The juror answered, "Yes, with a question mark." The trial judge then instructed the juror to answer yes or no, at which time the juror answered, "Yes." Over objection, the trial judge then accepted the verdict. On appeal, the conviction was reversed, the court holding that the juror's response indicated a doubt about the verdict's unanimity.

Similarly, in *Matthews v. United States,* 252 A.2d 505, 506 (D.C.1969), the following dialogue took place:

Deputy Clerk: Sarah I. Stackhouse.

Stackhouse: Guilty. Your Honor, can I ask about the pettit [sic] larceny?

Court: That is all, either guilty or not guilty.

Stackhouse: I can't express myself any further?

Court: No, you can only—

Stackhouse: *It is conditional.*

Court: *You have to answer either guilty or not guilty.*

Stackhouse: Guilty.

(emphasis in the original).

The conviction in that case was reversed on appeal. The court reasoned that "when the juror stated that her verdict was conditional, the trial judge should have been alerted to the probability that there might not be unanimity in the verdict." *Id.*

In both *McCoy* and *Matthews,* the courts were faced with jurors who were equivocal in stating their verdict, i.e., they indicated that their verdicts were either accompanied by a question mark or conditional. In the instant case, Mr. Manders showed no hesitation in declaring that his verdict was guilty. Unlike the situations in *McCoy* and *Matthews,* Mr. Manders' question was not framed in conjunction with his verdict. He did not state that his verdict was conditional nor did he say that his verdict was guilty with a question mark. Rather, his answer was firm and resolute.

Appellant's reliance on *Commonwealth v. Corbin*, 215 Pa. Super. 63, 257 A.2d 356 (1969), is also misplaced. There, the defendant had been tried on three separate indictments charging robbery, burglary, and conspiracy. When the jury was polled, jurors Nos. 9 and 10 said that they had found the defendant not guilty of robbery, whereupon, the trial court determined that the jury was unanimous as to the burglary and conspiracy charges but not as to the robbery indictment. At that time, juror No. 12 began to ask a question, but the trial judge refused to allow him to do so.

On appeal, the court held that none of the verdicts could stand. In light of the dissent by jurors Nos. 9 and 10 from the robbery verdict, the Superior Court held that "we cannot ascertain whether juror 12 would have dissented from the robbery verdict, as had jurors 9 and 10, or from the burglary and conspiracy verdicts, nor should we speculate about such matter." *Id.* at 66, 257 A.2d at 358. In the instant case, the chaos surrounding the polling in *Corbin* was not present. Here, there was no disavowal of a verdict by other jurors followed by an announcement by the trial judge as to which charges had produced unanimous verdicts. There is no indication that Mr. Manders' verdict was anything but guilty. We are not to be understood as approving the trial judge's abrupt refusal to permit the juror to ask a question during the poll of the jury. It would have been better to permit the question, or at least inquire if it pertained to the verdict, in order to assure the parties that it did not signify dissent.[3] Nevertheless, in view of the juror's firm and unequivocal assent to the foreman's announcement of the verdict, we do not believe that the mere general request to ask a question signified any lack of unanimity in this case.

 Appellant's final argument is that the evidence was insufficient to sustain his conviction for assault with intent to maim. He contends that the word "maim," as it is used

---

**3.** Or the jury may be returned to the jury room, from whence it can submit its question in writing. *See United States v. Lee,* 532 F.2d 911, 915 (3d Cir.1976).

in Md.Ann.Code art. 27, § 386, is the modern equivalent of the common law term "mayhem," which was "depriving the victim of the use of the 'fighting members' of his body." R. Gilbert and C. Moylan, *Maryland Criminal Law: Practice and Procedure* § 3.9 (1983). Appellant's contention is that he did not assault Burlingame with the intent to deprive Burlingame of the use of the fighting members of his body. He shot the victim in the lower back.

Appellant, however, was not convicted of mayhem. He was convicted of violating Md.Ann.Code art. 27, § 386, assault with intent to maim, disfigure or disable. The scope of that crime is considerably broader than the crime of mayhem. *See Marks v. State,* 230 Md. 108, 185 A.2d 909 (1962). In fact, appellant's argument that mayhem has evolved into maim is negated by the fact that the common law crime of mayhem still exists in its pristine form in Maryland, co-existing with the statutory crime codified in § 386. *See also,* R. Gilbert and C. Moylan, *supra,* at §§ 3.9—3.9–3. We hold, therefore, that the evidence was sufficient to convict appellant of assault with intent to maim.

JUDGMENTS AFFIRMED.

COSTS TO BE PAID BY APPELLANT.