540 A.2d 1151

**Leonard P. CIRINCIONE**

**v.**

**STATE of Maryland.**

**No. 1244, Sept. Term, 1987.**

Court of Special Appeals of Maryland.

May 9, 1988.

168

Richard M. Karceski (White & Karceski, on the brief), Towson, Clarence W. Sharp, Annapolis, for appellant.

Mary Ellen Barbera, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Stuart O. Simms, State's Atty. for Baltimore City and Timothy Doory, Asst. State's Atty. for Baltimore City, on the brief), Baltimore, for appellee.

Argued before GILBERT, C.J., and MOYLAN and WENNER, JJ.

MOYLAN, Judge.

The appellant, Leonard P. Cirincione, was convicted by a Baltimore City jury, presided over by Judge Kathleen O'Ferrall Friedman, of 1) the premeditated first-degree murder of Baltimore City Police Officer Richard Miller, 2) the attempted murder in the first degree of Officer Paul Aires, and 3) an assault upon Officer Michael Parker.

All three crimes occurred on 33rd Street in close proximity to Memorial Stadium at approximately 6:30 P.M. on June 12, 1986. The three officers were directing traffic as it converged on the vicinity of the stadium for a Baltimore Orioles baseball game scheduled for 8 P.M. that evening. The dangerous and deadly instrumentality directed at all three officers was the 1977 Toyota sedan driven by the appellant. The evidence was sufficient to permit jury findings that the appellant had, on two occasions, aimed the Toyota at the three officers, hitting and killing one and narrowly missing the other two.

Upon this appeal, the appellant raises the following seven contentions:

1. That Judge Friedman erroneously refused to permit Dr. Michael Spodak to offer an expert opinion as to whether the appellant had the specific intent to kill;

2. That Judge Friedman erroneously refused to permit Dr. Spodak to testify as to conclusions formed as to the appellant's intoxication by doctors on the staff of the Clifton T. Perkins Hospital Center;

3. That Judge Friedman erroneously granted the State's request for a postponement of trial and erroneously denied the appellant's motion to strike the State's election to seek the death penalty;

4. That Judge Friedman erroneously permitted the State to offer photographs showing damage to the appellant's automobile, notwithstanding an earlier informal agreement to stipulate as to the cause of damage;

5. That Judge Friedman committed plain error in her instructions to the jury;

6. That Judge Friedman erroneously disallowed hearsay testimony from the appellant's father consisting of an out-of-court declaration made to the father by a turnkey at the Northern Police Station; and

7. That Judge Friedman erroneously allowed the prosecutor to badger the appellant during the course of the appellant's cross-examination.

We see no merit in any of the contentions. Only the first two merit significant discussion. Both contentions involve the effort of the appellant to prove that he was too intoxicated, by virtue of the use of drugs, to have formed a specific intent to kill.

This would not, of course, affect the conviction for assault upon Officer Michael Parker, because simple assault requires only a general intent. Neither would it affect a subsumed conviction for murder in the second degree because voluntary intoxication, even sufficient to erode existence of a specific intent, will only lower the degree of guilt in a murder case from the first degree to the second degree. *Chisley v. State,* 202 Md. 87, 106–107, 95 A.2d 577 (1953);

*but see Mock v. State,* 2 Md.App. 771, 774–775, 237 A.2d 811 (1968).[1] It would, however, affect the conviction for first-

---

**1.** There seems to be a paradox here, but careful recent analysis has resolved the apparent dilemma. Intoxication sufficient to erode the capacity to form a premeditated specific intent to kill (first-degree murder) would, *ipso facto,* erode the capacity to form a non-premeditated specific intent to kill (second-degree murder under a self-contradictory and illogical but nonetheless firmly established legal fiction that there could be a "conscious, fully formed and purposeful" intent to kill that would somehow not satisfy the watered-down definitions of "deliberate" and "premeditated"). One incapable of arriving at a decision (to kill) slowly is hardly capable of arriving at the same decision instantaneously, yet that is just what a hasty glance at the case law would seem to suggest. The principle that the absence of specific intent could preclude conviction for any crime requiring a specific intent—any of the attempts, any of Maryland's aggravated assaults, burglary, larceny, robbery, etc.—save only second-degree murder predicated upon the specific intent to kill would be bizarre.

The logical explanation as to why voluntary intoxication may negate first-degree murder but not second-degree murder has been provided by W. LaFave & A. Scott, *Criminal Law* (1972). Recognizing that there are four forms of murderous *mens rea*—1) intent to kill, 2) intent to inflict grievous bodily harm, 3) felony-murder, and 4) depraved-heart—the authors have explained that the absence of a specific intent to kill would, of necessity, obviate a conviction for that variety of murder in either of its degrees but could nonetheless support a second-degree murder conviction upon the "depraved-heart" theory, which requires only wanton recklessness and does not require any specific intent.

"Doubtless a better explanation is that one may be guilty of second degree murder, in most jurisdictions which divide murder into two degrees, by killing without any intent to kill or injure but with a high degree of recklessness (the "depraved heart" type of murder), and, as we shall see below, although intoxication can negative a required intention, it cannot (by the majority view) negative recklessness." *Id.* at 345.

"The real difficulty concerns the intoxicated person who conducts himself in a very risky way but, because of his drunkenness, fails to realize it. If his conduct causes death, should he escape murder liability? The person who unconsciously creates risk because he is voluntarily drunk is perhaps morally worse than one who does so because he is sober but mentally deficient. At all events, the cases generally hold that drunkenness does not negative a depraved heart by blotting out consciousness of risk, and the Model Penal Code, which generally requires awareness of the risk for depraved-heart murder (and for recklessness manslaughter), so provides." *Id.* at 545.

Thus, the erosion, through voluntary intoxication, of the specific intent to kill does not, as *Chisley v. State, supra,* may have unwittingly

degree murder, which requires a premeditated and deliberate intent to kill. It would, moreover, affect the conviction for attempted murder (of any degree), because any attempt requires proof of a specific intent to perpetrate the crime attempted.

There is no issue before us as to the criminal agency of the appellant. There is no issue before us as to the legal sufficiency of the evidence to prove every element of the crimes, including the specific intent to kill. The key issues concern only the question of whether the appellant was erroneously inhibited in his effort to disprove, through a showing of lack of capacity, that specific intent.

### The Facts in This Case

On nights, such as June 12, 1986, when the Orioles are playing at Memorial Stadium, the traffic pattern on 33rd Street from Loch Raven Boulevard on the east to Charles Street on the west is radically rearranged. From Charles Street to the stadium, four lanes are eastbound to accommodate the heavy traffic flow toward the stadium and its parking lots. From Loch Raven Boulevard westward, only one lane is westbound and that is not for through traffic but is reserved solely for the use of parking permit holders. All other traffic is rerouted north or south at Loch Raven Boulevard. The lanes are marked with orange plastic or rubber cone markers and each intersection is staffed by two or three police officers.

---

suggested, move the crime *down* from a higher level of blameworthiness (first degree) to a lower level of blameworthiness (second degree) within the context of the same murderous *mens rea* (intent to kill), but rather moves the crime *down and over* from a murderous *mens rea* requiring a specific intent to a different murderous *mens rea* not requiring such specific intent. It is an inescapable fact that even second-degree murder *of the intent-to-kill variety* is a specific-intent crime.

This explanation is completely compatible with what the Maryland case law has done. The only failing of the case law was the lack of a satisfactory doctrinal explanation of why it did what it did.

On June 12, the appellant left his home on East 33rd Street and drove westward toward the stadium. As he approached Loch Raven Boulevard, he failed to obey the police officers' direction to turn north on Loch Raven but continued westbound. He accelerated past a number of officers who were signalling him to stop. Officer Michael Parker was stationed at 33rd Street and Ednor Road to keep track of permit holders. He was standing at the edge of the second lane of traffic when he saw the appellant's Toyota coming toward him in the curb lane. As Officer Parker signalled the Toyota to stop, it moved into the second lane, accelerated, and swerved toward Officer Parker. He jumped back out of the way between the cones.

As the appellant passed in front of the stadium, he was in the second lane of traffic from the north curb. As he passed the stadium and approached the west parking lot, he turned to his left (south) and crossed three oncoming lanes of traffic. Both Officer Miller and Officer Aires were standing in the second lane in order to direct traffic onto the west parking lot. After both officers unsuccessfully waved for the appellant to stop, they began to run toward the south curb. The Toyota narrowly missed Officer Aires but struck Officer Miller, throwing him into the air. He landed on the hood of another automobile and was thrown across the street.

The appellant's Toyota continued across the remaining lanes of oncoming traffic and struck two cars waiting to go onto the Venable parking lot (on the south side of 33rd Street next to Eastern High School).

Officer Miller was severely injured. He was removed by ambulance to the hospital, where he died on July 21 as a result of his injuries.

As the police pulled the appellant out of his car and placed him under arrest, a number of television cameramen were in the area. A tape was made of the appellant immediately after the accident, and it was played in court for the jury. A number of witnesses described the appear-

ance of the appellant as normal and as showing almost no emotion. Others described him as angry and upset. Several quoted the appellant as saying, as he was taken out of his car, "You can't touch me, I didn't do anything wrong." He screamed that he had rights and that "This is the good old U.S. of A." He protested that something was wrong with his car and that was what made him hit the officer.

### The Particular Mens Rea Here In Issue

The appellant did not enter a plea of not criminally responsible, and nothing with respect to his sanity or his competence was before the trial court. The appellant did not attempt to assert a defense of diminished capacity, which defense, of course, is not recognized in Maryland law. After the State had rested its case in chief, the defense called Dr. Michael Spodak as an expert witness. A chambers conference ironed out the ground rules for Dr. Spodak's testimony. For the record, Judge Friedman made clear what Dr. Spodak would *not* be testifying about:

"Because counsel has had a discussion with the Court in chambers, out of the presence of the defendant, I am not sure that the issue has been fashioned on the record the way it should be but I am going to try to fashion it and if I have not done so accurately then I want both counsel to say so after I finish.

It is clear to me that the defense cannot attempt in any way to prove that the defendant is not criminally responsible. No plea of not criminally responsible has been filed. If one had been filed, the proof to be shown would be that the defendant at the time of the incident and as a result of a mental disorder lacked substantial capacity either to appreciate the criminality of his conduct or conform his conduct to the requirements of the law. That's not the issue in this case. And I trust that is understood by both counsel.

Nor is diminished capacity an issue in this case because it's not recognized under Maryland law and that is clearly set forth in *Johnson v. State,* 292 Md. 405 [439 A.2d 542

(1982)]. Just to make it very clear, the concept of diminished capacity is, as I understand it from the reading of *Johnson v. State* and specifically a footnote [at] page 425 [439 A.2d 542], allows evidence of a mental impairment of a legally sane defendant on the factual question of whether a particular accused had entertained the requisite mental state which attempted to establish that the defendant was generally, and I underscore generally, less capable than a normal person of forming requisite *mens rea.* That's not what I trust the defense is attempting to show nor is it what the doctor will testify to. And I specifically rule that he may not, because that's diminished capacity and Maryland does not recognize diminished capacity."

### The Opinion of Dr. Spodak

This brings us to the question of what Dr. Spodak would be testifying about. The defense in this case was based upon voluntary intoxication. At common law, as a general rule, "voluntary intoxication affords no excuse, justification or extenuation of a crime committed under its influence." *Hopt v. People,* 104 U.S. (14 Otto) 631, 633, 26 L.Ed. 873, 874 (1882); *Saldiveri v. State,* 217 Md. 412, 424–425, 143 A.2d 70 (1958); *Frank v. State,* 6 Md.App. 332, 334, 251 A.2d 249, 251 (1969). Even voluntary intoxication, however, may constitute a defense to a crime requiring a specific intent, "where intoxication exists to a degree that it deprives the accused of his capacity to form a specific intent." *Avey v. State,* 249 Md. 385, 388, 240 A.2d 107 (1968). An excellent discussion of the effect of voluntary intoxication upon specific intent crimes is Judge Eldridge's opinion for the Court of Appeals in *Shell v. State,* 307 Md. 46, 58–63, 512 A.2d 358 (1986). *See also State v. Gover,* 267 Md. 602, 606, 298 A.2d 378 (1973); *Biggs v. State,* 56 Md.App. 638, 648, 468 A.2d 669 (1983), *cert. denied,* 299 Md. 425, 474 A.2d 218 (1984); *Gover v. State,* 15 Md.App. 163, 289 A.2d 601 (1972).

*Shell v. State, supra,* also made it clear that there is no logical and, therefore, no doctrinal distinction between voluntary intoxication induced by alcohol and voluntary intoxication induced by the use of drugs. In *Shell,* as in the case now before us, the intoxicant was PCP.

This was the defense theory in this case and this was the purpose for the expert testimony of Dr. Spodak. The critical issue before the jury, whether characterized as a question of ultimate fact or as a mixed question of law and fact, was whether the appellant had the specific intent to kill Officers Miller and Aires.

 That issue, of course, was for the jury. Since "the test of admissibility of an expert's opinion should be whether his testimony will be of real appreciable help to the trier of fact in deciding the issue presented," *Shivers v. Carnaggio,* 223 Md. 585, 588, 165 A.2d 898 (1960), it follows that the expert's opinion must be based upon the same evidence of ingestion of intoxicating substances that was admitted before the jury. *Waltermeyer v. State,* 60 Md.App. 69, 79–80, 480 A.2d 831 (1984). For this purpose, lay witnesses testified to the facts concerning the appellant's intoxication, both for the direct benefit of the jury and to provide the predicate for Dr. Spodak's expert opinion. The guidelines set out by Judge Friedman were clear:

"The Court: I think you understand each other and I think the court understands you and just to make sure that we all understand, the defense is saying that it is presenting lay witnesses at this point *to introduce the facts that will provide a basis for testimony by experts* at the time of the alleged criminal acts the defendant, because of substance abuse, was so intoxicated that he did not possess reason or understanding and, therefore, did not have the requisite specific intent to commit first-degree murder; is that right, Mr. Cuomo?

Mr. Cuomo: Yes, Your Honor, in a nutshell that's accurate.

The Court: I have not gotten to the issue of what the expert can testify to. At this point, since there appears to be no dispute, you may call your lay witnesses and then I will rule on that issue when the time comes."

One witness testified that the appellant had told her four days before the fatal accident that he was going to buy some PCP flakes that night. Another witness testified that two days before the accident, the appellant had come to his store looking for PCP. A third witness viewed the video-tape made of the appellant right after the accident and offered the lay opinion that the appellant was "high on PCP because of the mindless look in his eyes." A fourth witness, the appellant's uncle, testified that he saw the appellant at about 3 P.M. on the day of the accident and the appellant "appeared very hyper and talkative."

The appellant's sister testified having had dinner with the appellant at about 5 P.M. on the day of the accident. She said that "he appeared more friendly and outgoing as if nothing would bother or agitate him." She attributed his calm behavior to his use of drugs "for the past eight years." The appellant's father described him as appearing "very solemn and quiet at dinner" that night and testified further that the appellant left the house without eating his food.

The television footage made of the appellant at the time of his arrest was played for the jury. The arresting officers and other witnesses, as we have already mentioned, described his demeanor immediately after the accident. A search of the appellant's vehicle revealed a partially burned PCP butt in an ashtray and two hand-rolled PCP cigarette butts ("roaches") in a pouch behind the driver's seat.

The appellant testified in his own defense. After describing his lengthy history of drug abuse, he recounted "going on a PCP binge" about a week before the accident and having smoked PCP "every day up to the accident." He testified that on June 12 he started smoking PCP during the afternoon. He testified that after dinner and shortly before

the accident, he smoked two joints of PCP in the general neighborhood of Clifton Park. He testified that as he was driving toward his friend's home on 33rd Street, he went "into a dream state in which he was conscious of the increased traffic." The next thing he remembered was "the thump, thump, thump and being slumped over in the car facing in the opposite direction and all the police and people around and he was being handcuffed and locked up and it dawned on him that he was the cause of the accident." He testified that he "did not realize that he had hit a police officer and did not intentionally or deliberately run over Officer Miller.

The evidence bearing directly on the consumption of intoxicants and the degree of intoxication on June 12 was not overwhelming. Judge Friedman was very generous, however, in allowing the defense to develop years of earlier drug abuse as indications of likely present behavior. In addition to the direct evidence of intoxication on the day of the accident, the defense was allowed to roam far afield. Numerous witnesses testified to the appellant's long history of drug abuse dating back to his last years in elementary school in 1974 or 1975.

Dr. Spodak, moreover, was permitted to base his opinion about the appellant's intoxication in part upon his long history of drug abuse, in part upon the report of Dr. Richmond who had examined the appellant before trial, and in part upon his own pretrial examination of the appellant. In no sense was the opinion of Dr. Spodak austerely limited. He testified at great length. He was allowed to testify, in the abstract, as to the general effects of PCP on the mind and on behavior. He fully explicated such phenomenon as "chemical dependence," "craving," "tolerance," "distorted sense of reality," "depression," "euphoria," "difficulty with impulse control," "auditory hallucinations," "extremes of violence in very high doses," "catalepsy," "a trance-like state where you have diminished responsiveness," and "waxing and waning of the effects of the drug."

Dr. Spodak was then allowed to explore the appellant's long history of drug abuse. He described the appellant's "physical brain impairment" as indicated by school records and psychology tests showing a result of "half normal" in "organic mental function." Dr. Spodak testified that the appellant's "neurological impairment" made him "specifically susceptible to the effects of PCP." He explained that the effect of PCP would be "even worse" on the appellant than on others. Dr. Spodak speculated that the appellant would become "more impulsive, go into one of those trance-like states, be more susceptible to losing touch with reality," and that the waxing and waning effect would be "more prominent with him as a result of some of the brain damage that we found on these tests."

The examination then turned to Dr. Spodak's expert opinion as to the effect of the drugs on the appellant's mind on the evening of June 12. Judge Friedman had already made it clear what the limits of that testimony would be:

"What I think that the defendant [is attempting] to do in this case is to present evidence demonstrating that the defendant did not as a fact, and I underscore as a fact, possess the requisite mental state for first-degree murder which is premeditation and deliberation. I am sure that the State understands, as well as the defense, that the burden is on the State to prove every element of the crime of first-degree murder beyond a reasonable doubt and that will include specific intent. But the defendant had to rebut the State's case; that's what the defense seeks to do. I will allow the doctor to testify based on the evidence that is presently before the jury and not on any assumptions by the doctor, and that goes for Dr. Richmond if she testifies as well.

So, I will say both doctors, each of them can give an opinion as to whether the defendant, because of substance abuse, was so intoxicated on the date of the incident that he possessed no reason or understanding at the time the alleged act occurred. The experts cannot state a conclusion that as a result of the degree of

intoxication he was incapable of forming the requisite *mens rea* which is the necessary element of this specific intent crime. And the reason for that is that although an expert may in certain cases testify on the ultimate issue of fact and I do think this is an ultimate issue of fact, the experts in this case cannot testify to the defendant's intention. Intention is a fact which the accused can testify to but it cannot be positively, no one, no other persons, on one can testify directly concerning the intention of another person. It is a matter to be determined by the jury as a finding from the established facts which would include the testimony of the witnesses presented by the defense including lay witnesses and the expert witnesses.

Those are the parameters under which I will allow the experts to testify."

It would appear, moreover, that appellant's counsel fully acquiesced in Judge Friedman's guidelines:

"The Court: Defense?

Mr. Cuomo: Your Honor, for the reasons stated, we have no further comment on the court's position. Does Dr. Spodak? Do you want to question Dr. Spodak whether or not he understands the parameters?"

When defense counsel twice asked Dr. Spodak for his opinion as to the appellant's ability to form the requisite specific intent to commit first-degree murder, Judge Friedman twice sustained the State's objection.

The appellant cites numerous statements by this Court and by the Court of Appeals that "[e]xpert opinion which will aid the trier of fact is admissible even on issues of 'ultimate fact.'" *White v. State*, 66 Md.App. 100, 114, 502 A.2d 1084 (1986); *Cider Barrel Mobile Home Court v. Eader*, 287 Md. 571, 584, 414 A.2d 1246 (1980). The appellant has not cited a single instance, however, where the failure to permit an opinion as to the "ultimate fact" was held to be reversible error, where the opinion had been allowed to develop the component predicate facts that

would logically yield that "ultimate fact." Indeed, in this case the difference between the ultimate fact and the penultimate fact was so minuscule as to be legally insignificant.

Dr. Spodak did offer the opinion that the appellant was "severely intoxicated" on PCP "to the point where he was clearly under the influence of it." He offered the opinion that the appellant was in "a trance-like state." He offered the ultimate opinion that "because of the substance abuse and degree of intoxication ... he possessed no reason or understanding at the time of the crime."

That conclusion was in precisely the terms used by Judge Digges in *State v. Gover*, 267 Md. 602, 608, 298 A.2d 378 (1973), to define the condition that would render one incapable of forming a specific intent:

"If the trier of fact determines that at the time the alleged criminal act occurred, the accused had become so inebriated that he possessed no reason or understanding, then he has reached that stage of intoxication that renders him incapable of forming the requisite *mens rea* which is a necessary element of all specific intent crimes."

*See also Johnson v. State*, 292 Md. 405, 425 n. 10, 439 A.2d 542 (1982).

As we assess whether Judge Friedman was guilty of a clear abuse of discretion in making her evidentiary ruling, we find helpful the words of Judge Wilner in *Waltermeyer v. State*, 60 Md.App. 69, 79, 480 A.2d 831 (1984):

"To put the issue in its proper perspective, we have to start with the basic proposition that the admissibility of expert or opinion testimony is largely within the discretion of the trial court, subject to review on appeal, and that 'the test of admissibility of an expert's opinion should be whether his testimony will be of real appreciable help to the trier of fact in deciding the issue presented.' "

In terms of its helpfulness to the jury, we find the distinction between an opinion as to a predicate fact that

inevitably yields the ultimate fact and an opinion as to the ultimate fact itself to be a distinction without a difference. We will not hypothesize a jury so dense that it would be helped by the latter opinion but would be left adrift by the former.

The situation before us is remarkably parallel to that which was before us in *Waltermeyer v. State.* There, as here, the expert was not permitted to offer an opinion directly as to the ability of the defendant to form a specific intent. There, as here, the expert did testify, in the words of *State v. Gover,* that the appellant there was so inebriated at the time of the killing that "he would possess no reason or understanding." 60 Md.App. at 81, 480 A.2d 831. The jury instruction in that case was virtually indistinguishable from that given by Judge Friedman in this case. Our conclusion here is the same as was our conclusion there:

"In light of these instructions, we think that appellant received essentially what the law requires. If the jury believed and credited Dr. Donner's opinion that appellant was so inebriated that he possessed no reason or understanding and that he could not appreciate what he was doing or conform his conduct to the requirements of the law, under the court's instructions, it would have had to acquit. That it did not do so, upon this record, cannot reasonably be attributed to the lack of an opinion on the 'ultimate issue,' but rather to the fact that it simply did not believe even the lesser opinion rendered by Dr. Donner. If there was error, in the form of an abuse of discretion, in not allowing the more direct opinion sought by counsel, it was clearly harmless beyond a reasonable doubt."

*Id.* at 83, 480 A.2d 831. Although we agree that if there had been error it would have been clearly harmless, we hold that there was no error.

### One Expert's Reference to Other Experts

 The appellant complains that Dr. Spodak was not permitted to make reference to the report of the Clifton T. Perkins Hospital Center. A bench conference revealed that

what appellant's counsel wanted to develop was that three doctors at the Clifton T. Perkins Hospital had reached the opinion that the appellant "was voluntarily intoxicated on PCP." Quite properly, Judge Friedman sustained the State's objection to this palpable hearsay. The appellant may not, through one expert, offer independently the opinions of three other experts.

The appellant now argues, but did not argue below, that the opinions of the Clifton T. Perkins doctors represented a basis for Dr. Spodak's opinion. This theory of admissibility was not urged before Judge Friedman, and there is no indication that the conclusions of the out-of-court experts were being offered for anything other than their substance. Although in this case it was a testimonial reference to the contents of a document rather than the document itself that was being offered, the situation is doctrinally indistinguishable from that which was before us in *Gregory v. State,* 40 Md.App. 297, 326, 391 A.2d 437 (1978):

"The document was offered without limitation as to purpose, and therefore for its truth. Thus, the jury was not merely advised of the fact that three staff psychiatrists had formed certain opinions; it was asked to accept as true—*i.e.,* to believe—the opinion of these three physicians that appellant was 'sane' at the time he entered the bank.

This is critical evidence of a testimonial nature, pertaining directly to appellant's ultimate 'guilt,' that could, and should, have come *viva voce*—from the mouths of the witnesses in court, where, under the watchful eye of the jury, they could be cross-examined in the same manner as those physicians who did testify. There is nothing in the record to show that any of these three doctors were unavailable to appear in court; and we must assume that they did not appear simply because they were not summoned."

If the appellant had wanted the opinions of the Clifton T. Perkins doctors, he could have summonsed them to court. The appellant will not be permitted to get four expert

opinions for the price of one. The proffered opinions that "he was voluntarily intoxicated," moreover, were too ambiguous to be helpful. How intoxicated? Enough so that he "possessed no reason or understanding"? Probing cross-examination was indispensable.

Offered, on the other hand, as the basis for Dr. Spodak's opinion, the argument is thrice-flawed. First, there was the procedural dereliction that this limited purpose, which would at the very least have involved limiting instructions, was not urged upon the court.

In the second place, Dr. Spodak's opinion was not as broad-based in terms of its predicate as would ordinarily be permitted a diagnostic physician. Dr. Spodak was not called upon to give an opinion as to the appellant on the basis of prior history, a long course of treatment, or other background data developed by a physician. Dr. Spodak's limited purpose was to assist the jury by offering an opinion as to what level of intoxication would probably result from the ingestion of drugs as revealed by the evidence before the jury. The substantive opinions of other doctors was simply not part of the evidence of intoxication before the jury in this case.

Even had Dr. Spodak been a more broad-ranging diagnostic physician, moreover, the opinions of the Clifton T. Perkins doctors would not have been a proper predicate for his own opinion. They did not offer background data such as the results of I.Q. tests, Rorschach tests, brain scans, etc. They offered simply their own expert conclusions based upon essentially the same evidence that was before Dr. Spodak. The reassurance that others have reached similar conclusions is not a basis on which Dr. Spodak may properly construct his own conclusion.

For any of these reasons, we see no error.

### The Postponement of the Trial Date and the State's Election to Seek the Death Penalty

The appellant complains about the rescheduling of his trial from February 25, 1987, to April 1, 1987, a delay

of 34 days. In the first place, there is no *Hicks* problem. On the original trial date of October 17, 1986, the appellant executed a *Hicks* waiver and requested a postponement so that the appellant, contemplating a possible insanity plea, could be evaluated by Dr. Spodak.

A contemporaneous filing of a plea of not criminally responsible caused the appellant to be referred to the Clifton T. Perkins Hospital Center. The staff report from Perkins was issued on February 11 and filed with the court on February 17, one week before the scheduled trial.

On February 17, the State requested a thirty-day postponement so that it might review the Perkins report "in depth" in order to determine whether to seek the death penalty. That request was granted and the case was rescheduled for trial on April 1.

There is not even remotely a constitutional speedy trial issue in this case. None of the four factors spelled out in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), would even minimally tilt in the appellant's favor.

The only claim he really urges is that if the original February 25 trial date had been adhered to, the State, under a thirty-day rule, would have been precluded from seeking the death penalty. This argument intertwines with his argument that the trial judge erroneously refused to strike the State's election to seek the death penalty. There is no merit in it for several reasons.

To begin with, there was no prejudice to the appellant. He did not receive the death penalty. His argument that a death-qualified jury was more likely to have found him guilty has been squarely rejected by the Supreme Court of the United States. *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986).

The election to seek a death penalty, moreover, is a prerogative resting exclusively with the State's Attorney's Office, part of the executive branch of government. The appellant has shown us no authority that even suggests

that the judicial branch of government is empowered to interfere with the exercise of the authority vested exclusively in an equal and coordinate branch of government. We know of none.

### The Other Contentions

The appellant's remaining contentions will not detain us long. The State offered photographs showing the damage to the appellant's automobile. An officer, who was at the scene, interpreted those photographs. There was nothing remotely improper in what was done. The appellant haggles over the fact that at an in-chambers conference, the State apparently agreed to stipulate that certain damage to the automobile, shown by the photographs, was not caused by the car's collision with Officer Miller but rather by its subsequent collision with other automobiles. The State had one recollection as to this agreement. The appellant and Judge Friedman had another. In any event, the truth was fully and adequately pursued through the trial forum. We see no abuse of discretion on the part of the trial judge.

The appellant also urges that Judge Friedman's jury instructions were erroneous in three regards. No objections were lodged and nothing is preserved for appellate review. Nothing in this case remotely moves us to exercise our discretion by way of granting the extraordinary relief of overlooking this non-preservation under the notion of "plain error."

In the course of the direct examination of the appellant's father, the father attempted to pass on an out-of-court declaration by the turnkey at the Northern District Police Station that the appellant "was acting wild." Judge Friedman properly sustained the State's objection to this violation of the hearsay rule. Appellant's counsel agreed that the father was offering inadmissible hearsay and pushed the matter no further. There is nothing preserved for appellate review.

The appellant's final contention is that, "during the course of the cross-examination of the appellant, the State engaged in a series of questions and improper comment designed to force appellant to agree that he had planned and attempted to convince the doctors that he was intoxicated at the time of the incident." That, of course, is the purpose of good cross-examination. The appellant now objects to the whole line of cross-examination and to the alleged involvement of Judge Friedman on the side of the State. At trial, however, the appellant objected only to several isolated questions. In none of those instances do we see error. Nothing else is before us.

JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.