523 A.2d 1064

**Byron ARCA**

v.

**STATE of Maryland.**

**No. 1077, Sept. Term, 1986.**

Court of Special Appeals of Maryland.

April 15, 1987.
Certiorari Denied Aug. 3, 1987.

Mark Colvin, Asst. Public Defender (Alan H. Murrell, Public Defender, on brief), Baltimore, for appellant.

Jillyn K. Schulze, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Kurt L. Schmoke, State's Atty. for Baltimore City and Gary Schenker, Asst. State's Atty. for Baltimore City, on brief), Baltimore, for appellee.

Argued before MOYLAN, WILNER and POLLITT, JJ.

WILNER, Judge.

We have tried on occasion to caution prosecutors against overkill, against pounding so many nails into the defend-

ant's coffin that they split the wood and have to start again. We recognize, of course, that, as an appellate court, we get to view the case from the enviable position of hindsight, and that what may seem to us to be unnecessary overkill may not seem so to the participants in a hotly contested trial. That is why, especially on matters relating to the conduct of the trial and the allowance or disallowance of evidence, we accord considerable deference to discretionary rulings of the trial judge and do not reverse unless there is manifest error. Here, we think, the court allowed the State to go too far, and so we shall reverse.

Appellant was charged with the first degree murder of George Henderson. A jury in the Circuit Court for Baltimore City acquitted him of that but convicted him of manslaughter.

There was no question but that he did, in fact, kill Mr. Henderson; through counsel, he conceded that in opening statement. He admitted that, on the evening of September 21, 1985, he was in the 1600 block of Gorsuch Avenue in Baltimore City talking to one or two young ladies when Henderson approached and made some remark to the girls. An argument of sorts followed, whereupon appellant delivered a karate-type kick to Henderson's head, causing Henderson to fall backward and strike his head on the pavement. Either the kick or the fall caused Henderson to fracture his skull and fatally injure his brain.

That appellant was the actor—the cause of Henderson's death—was never an issue at trial. He conceded it in a statement given to the police; counsel conceded it to the jury; an eyewitness to the event positively identified him in court without challenge. Appellant's sole defense was that he had acted in self-defense—that Henderson was the aggressor. The story he gave the police, which came into evidence as part of the State's case, was that Henderson had thrown a bottle at him and had then acted in such manner as to lead appellant to think Henderson was reaching for a weapon. That, said appellant, is when he kicked Henderson "once up around his face" in order "to get him

to back up off of me." Counsel told the jury in his opening statement that the evidence would show only "that during a mutual affray, during a fight, my client kicked this man."

The issue, then, was whether appellant's attack on Mr. Henderson was aggressive, premeditated, malicious, and unjustified, as urged by the State, or defensive, as claimed by appellant. Although appellant elected not to testify, there was evidence to support both views.

The State's first witness was Patricia Morgan, who had witnessed the episode. She described what had occurred and identified appellant in court as the person who kicked and ultimately killed Mr. Henderson. According to her, the kick was deliberate and unprovoked. No objection was made to her identification of appellant and she was not cross-examined about the accuracy of it. The next witness, Detective Garvey, related the statement appellant had given upon his arrest and also testified that Ms. Morgan had selected appellant's photograph from an array he had shown her several days after the event. The State then moved into evidence the photographic array, including what is obviously a police "mug shot" of appellant. Despite appellant's objection based on relevance—that identification was not an issue—the court admitted the photographs. Those photographs were not actually shown to the jury, however. At the court's direction, Xerox copies of the photographs, with the chestplate containing identification numbers covered over, were made and were given to the jury in substitution for the actual photographs. The display of even those somewhat sanitized photographs constitutes appellant's first claim of error, one which we find to be valid.[1]

The Court of Appeals addressed the problems raised by the introduction of police "mug shots" in *Straughn v. State,* 297 Md. 329, 465 A.2d 1166 (1983). Police photo-

---

1. We find no merit to the State's contention that appellant waived this argument by failing to make a proper objection. He did indeed object to the photographs being shown to the jury in any form.

graphs, on the one hand, are "independently relevant substantive evidence which may be introduced under certain circumstances," *id.*, 334, 465 A.2d 1166, but they also have the potential for undue prejudice by alerting the jury to the distinct possibility that the defendant has a prior police record, thereby taking on a form of prohibited "other crimes" evidence. The Court concluded that the admission of these photographs "is a discretionary matter for the trial court" and that "[i]n the exercise of its discretion, the trial court must balance the probative value of the mug shots against their prejudicial impact on the defendant." *Id.*

The *Straughn* Court rejected any rigid criteria or litmus test for evaluating the exercise of the trial court's discretion, such as had been adopted in *United States v. Harrington*, 490 F.2d 487 (2d Cir.1973), preferring instead to balance "all of the factors that might prejudice the defendant." *Id.*, 297 Md. 329, 336, 465 A.2d 1166. Among those factors, however, are those enunciated in *Harrington*, namely, whether the State had "a demonstrable need to introduce the photographs," whether the photographs shown to the jury imply a prior criminal record, and whether the manner of introduction draws particular attention to the source or implications of the photographs.

A critical element in any balancing process, of course, is what the *Harrington* Court referred to as the State's need for the photographs: were they relevant to any issue in the case; were they merely cumulative to other unimpeached evidence? If the State has no real need to introduce the photographs, there is nothing against which to balance any prejudice to the accused.

In most cases where police photographs are offered, the identity of the defendant, either as the criminal agent or as a recidivist for enhanced punishment purposes, is at issue, and the photographs are offered to help establish that identity. *See* Annot., *Admissibility, And Prejudicial Effect Of Admission, Of "Mug Shot," "Rogues' Gallery" Photograph, Or Photograph Taken In Prison, Of Defendant In Criminal Trial*, 30 A.L.R.3d 908 (1970). Here, as

we have observed, identity was not in issue. The State had absolutely no need for the photographs—either the original array or a "sanitized" copy of them. They simply were not relevant to any issue that the jury would be asked to decide. The State's side of the scale, then, has a weight of zero.

Notwithstanding the court's effort to ameliorate the prejudicial effect of the photographs, the implication that appellant had prior police contact remained strong. Unlike the situation in *United States v. Johnson,* 623 F.2d 339 (4th Cir.), *cert. denied* 449 U.S. 957, 101 S.Ct. 366, 66 L.Ed.2d 222 (1980), the jury knew that the police had appellant's photograph *before* his arrest for this offense and could reasonably infer that, if they included it in an array shown to Ms. Morgan, they had some reason to believe that he was the kind of person who might commit such a crime. Moreover, though "doctored," the photographs still showed the front and profile view commonly associated with police "mug shots."

The potential for undue prejudice in this case is more than speculative. With the defense being self-defense, the jury's decision could well have been influenced by the thought that appellant had a prior record and was consequently a bad person. Indeed, while deliberating on their verdict, they asked that specific question—"Does Byron [appellant] have a prior arrest and or conviction record[?]" —which the court declined to answer. In the circumstances of this case, the admission of the police photographs constituted error.

Our conclusion on that issue requires a reversal and remand for retrial and thus obviates the need to consider appellant's other three claims involving alleged trial error. We have considered appellant's contention that the evidence was insufficient to sustain the conviction of manslaughter, however, and find it completely without merit.

JUDGMENT REVERSED; CASE REMANDED TO CIRCUIT COURT FOR BALTIMORE CITY FOR NEW TRIAL;

MAYOR AND CITY COUNCIL OF BALTIMORE TO PAY THE COSTS.