**Newman v. State, No. 2629 of the 2016 Term, Opinion by Moylan J.**

**HEADNOTE:**

FIRST-DEGREE MURDER – "FOUL DEEDS WILL RISE, THOUGH ALL THE EARTH O'ERWHELM THEM TO MEN'S EYES" – TWO CONTENTIONS – A TALE OF THE MACABRE – "A JUG OF WINE, A BOOK OF VERSE, AND THOU" – AND THEN THERE WERE TWO – "OUR REVELS NOW ARE ENDED" – "OUT, DAMNED SPOT!" – DUSTIN ALERTS THE POLICE – THE EUMENIDES – SOME NUANCES OF SELF-DEFENSE – THE STANDING EPITHET "UNFAIR" DELIMITS THE NOUN "PREJUDICE": A CLOSE LOOK AT RULE 5–403 – MINIMALISM IS NOT REQUIRED: NEED FOR THE EVIDENCE AS A NON-FACTOR – CHERCHEZ THE ADVERB – APPELLATE DEFERENCE AS A CRITICAL DECISIONAL FACTOR – THE APPELLANT'S FACEBOOK PICTURE – PROBATIVE VALUE – THE ABSENCE OF ANY UNFAIR PREJUDICE – ARCA V. STATE AND BANKS V. STATE – A JURY INSTRUCTION ON VOLUNTARY INTOXICATION – THE INSTRUCTION WAS CORRECT – THE EVIDENCE GENERATED THE INSTRUCTION – VOLUNTARY INTOXICATION AND SPECIFIC INTENT – VOLUNTARY INTOXICATION GENERALLY

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2629

September Term, 2016

_____

TERRENCE NEWMAN

v.

STATE OF MARYLAND

_____

Beachley,
Fader,
Moylan, Charles E., Jr.
 (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Moylan, J.

_____

Filed: April 4, 2018

**"Foul Deeds Will Rise, Though All The Earth
O'erwhelm Them To Men's Eyes"[1]**

For three weeks, it seemed that the appellant, Terrence Omar Newman, Jr., may well have committed a perfect crime. One relentless nemesis he could not shake off, however, turned out to be his own still voice of conscience. As a direct result of his own unsolicited revelations, he was ultimately convicted by a Baltimore County jury, presided over by Judge Ruth Ann Jakubowski, of the first-degree murder of Carlita Coleman. He was sentenced to life imprisonment.

## Two Contentions

With a troubled psyche that might have led a psychiatrist to suspect that he, subconsciously, wanted to be caught, the appellant's chosen contentions are relatively small bore. He asserts

1. that a photograph of him used in his initial identification by the police, albeit unquestionably relevant, was so unfairly prejudicial that it should not have been received in evidence; and

2. that, in jury instructions, the jury should never have been invited to consider his state of possible inebriation.

## A Tale Of The Macabre

The statement of facts could have been written by Edgar Allan Poe. The time was Thursday, October 15, 2015. The place was Catonsville. A small neighborhood Gilston Park was the site for an informal gathering of the extended Archibald family for a leisurely afternoon of drinking and listening to music. The park was generally wooded but included

---

[1] <u>Hamlet</u>, Act 1, Scene 2.

a pavilion with several picnic tables on its periphery. The gathering convened shortly after 2:00 p.m. Initially in attendance were 1) Reba Archibald; 2) Reba's brother, Dustin Archibald; and 3) Dustin Archibald's girlfriend, Nicole Hokanson. Within the hour, the group was joined by the appellant. The appellant was the ex-boyfriend of Reba Archibald and a good friend of Dustin Archibald. Another brother, Ronald Archibald, joined the group at about 4:30 p.m. but left the group to go to work shortly before 5 p.m. It was at about 5 p.m. that the ultimate murder victim, Carlita Coleman, joined the group. She had formerly been a close friend of Reba Archibald. Generally speaking, the entire group had known each other for several years, dating back to high school.

### "A Jug Of Wine, A Book of Verse, And Thou"[2]

Throughout the afternoon, it was the appellant who provided beverages for the group. The first serving was from a water bottle filled with slightly watered-down vodka. The appellant shared it with Dustin and Nicole. Reba did not drink. When the threesome had finished the vodka, the appellant repaired to a nearby Walmart and returned with an ill-fated bottle of wine. Ill-fated because the bottle was corked but the revelers had no corkscrew. With the swashbuckling panache of an Anthony Quinn, however, the appellant broke off the neck of the bottle on a nearby tree. The break, unfortunately, came well below the neckline, and a bare pint remained in what had been a receptacle designed for a quart. The final resupply mission eschewed viniculture and produced "two big gallons of vodka." "And the band played on."

---

[2] Rubáiyát of Omar Khayyám.

## And Then There Were Two

Tempting as the vodka may have been, for Dustin Archibald it was no rival for Thursday Night Football, to which he was incorrigibly addicted. By 7 p.m., he and Nicole left the party in order to be comfortably in place for the New Orleans Saints–Atlanta Falcons kickoff. And then there were three.

As the appellant's ex-girlfriend, Reba Archibald was for the next half-hour very much a neglected fifth wheel. The appellant and Carlita Coleman, who had not known each other before that afternoon, were rapidly making up for lost time. As Reba sat, forlorn, at one table, the new acquaintances, both described by Reba as "flat out drunk," adjourned to a separate table for an escalating session of ill-defined but ill-disguised sexual play. Discretion prevailed and Reba left for home. And then there were two.

## "Our Revels Now Are Ended"[3]

With the departure of Reba Archibald at 7:30 p.m., the screen went blank. But for his inner demons, life for the appellant went on as normal for the next three weeks. If Carlita Coleman was missing, the world was unaware of it. As for family, her former foster-mother was not even aware of her current street address. No one else seemed to care. The Archibalds, who had hosted the party of October 15, were oblivious to the fact that their family outing had gone disastrously south. For the appellant himself, October 15 might have been dismissed as nothing more than a drunken nightmare. The appellant had left neither fingerprint nor DNA nor any other personal token at the murder scene. He may

---

[3] The Tempest, Act IV, Scene 1.

have been the last person seen with the victim alive, but the significance of that circumstance, standing alone, would diminish with each passing day. Even murder most foul was on its way to becoming "nameless here for evermore."[4] And then there was one.

## "Out, Damned Spot!"[5]

The allusion to Lady Macbeth is not inapt. When the appellant three weeks later brought his unsolicited confession of guilt to Dustin Archibald, his pursuit by his inner demons had become truly Shakespearean. As Dustin recounted:

> At first he was telling me that he <u>needed hand sanitizer</u> and he <u>needed to wash his hands</u>. And he kept going on about <u>needing to wash his hands. Needing to wash his hands, over and over again.</u>

(Emphasis supplied).

When the appellant arrived at the Archibald home at about 11 a.m. on November 5, 2015, his hand, according to Dustin, "smelled like a dead skunk." That was the hand that could not be washed clean and that apparently "could the very seas incarnadine." The appellant was wrestling unsuccessfully with troubled flashbacks. There were maggots, moreover, crawling over his lower pants and shoes. Dustin Archibald's recounting of the appellant's initial confession was sketchy and in extremely general terms.

> <u>He told me that he did something bad.</u>
> . . . .
> <u>He said that he didn't mean to do it.</u>

(Emphasis supplied).

---

[4] <u>The Raven</u> by Edgar Allan Poe.

[5] <u>Macbeth</u>, Act 5, Scene 1.

With respect to the maggots, Dustin recounted the appellant's explanation.

> MR. ARCHIBALD:  He told me that <u>he went back at the spot in the park.</u> And this is after he admitted to me. He told me he went back and he checked and <u>he buried it back with more leaves.</u> He said, <u>he saw maggots all</u> over the, all <u>over it</u> everywhere. He was wanting me not to go to the park because "the smell is getting stronger. The smell is getting stronger."

(Emphasis supplied). The antecedent of the grim pronoun "it" was clearly "Carlita Coleman." With respect to the murder itself, the confession was in frustratingly general terms.

> [PROSECUTOR]:  Now, I'm going to back you up a little bit. When he tells you that he – what is the word the defendant used about hurting Carlita Coleman?

> MR. ARCHIBALD:  <u>He said that he "strangled" her.</u>

> [PROSECUTOR]:  Okay. What did the defendant say about strangling Carlita Coleman?

> MR. ARCHIBALD:  He said, at first <u>he said that the defendant [sic] hit him in the nose and he strangled her</u>, and then <u>he said he saw her take her last breath.</u>

(Emphasis supplied).

In terms of the homicidal narrative provided by the appellant's confession, Dustin's direct examination effectively concluded:

> [PROSECUTOR]:  After she took her last breath what did the defendant tell you that he did?

> MR. ARCHIBALD:  He, he told me that <u>he dragged her to the woods and walked on home.</u> Went, went home.

(Emphasis supplied).

Dustin then acknowledged a frisson of personal fear at the appellant's expression of buyer's remorse about having incautiously confessed to Dustin.

> [PROSECUTOR]: Okay. What if anything did the defendant say to you about regret?
>
> MR. ARCHIBALD: <u>He told me that he don't [sic] think he should have told me.</u>

(Emphasis supplied). That worried Dustin. Did he now know too much for his own good?

Dustin on cross-examination essentially regurgitated what he had earlier said on direct examination.

> [DEFENSE ATTORNEY]: Okay. So when you say, and based on my question I'm asking you, <u>if he told you that she attacked him</u> you said, <u>that's what he said, correct?</u>
>
> MR. ARCHIBALD: <u>Correct.</u>
>
> [DEFENSE ATTORNEY]: <u>Just like he said that he didn't mean to do it, correct?</u>
>
> MR. ARCHIBALD: <u>Correct.</u>
>
> [DEFENSE ATTORNEY]: <u>Just like he said that he did something wrong, correct?</u>
>
> MR. ARCHIBALD: <u>Correct.</u>
>
> [DEFENSE ATTORNEY]: <u>Just like he said he strangled her, correct?</u>
>
> MR. ARCHIBALD: <u>Yep.</u>
>
> [DEFENSE ATTORNEY]: And he was specific that he <u>said he did that after she attacked him, correct?</u>
>
> MR. ARCHIBALD: <u>Correct.</u>
>
> [DEFENSE ATTORNEY]: <u>He also said that he blacked out, didn't he?</u>

MR. ARCHIBALD:  Yeah.

(Emphasis supplied).

The redirect examination of Dustin added little:

[PROSECUTOR]:  . . . . [Defense Attorney] was asking you about the defendant's statements regarding Carlita attacking him. Did he use the word "attack"?

MR. ARCHIBALD:  He said hit him in the nose.

(Emphasis supplied).

Had there been no more than the above, it would have been painfully thin gruel with which to nourish the infinite nuances of the homicidal mens rea—the specific intent to kill, premeditation, perfect self-defense, imperfect self-defense, hot-blooded response to legally adequate provocation, mutual affray, response to an unprovoked battery, depraved heart murder, gross criminal negligence, voluntary inebriation.

**Dustin Alerts The Police**

Fearful that the appellant might be seriously reconsidering the wisdom of having made Dustin privy to the final climactic scene between the appellant and Carlita Coleman, Dustin took his concern to his girlfriend, Nicole, at her place of work. She convinced him that, for his own protection, he needed to bring the matter to the attention of the police. He did so. By way of identifying the appellant, Dustin procured (probably through his sister, who had been the appellant's girlfriend for over a year) a Facebook photograph of the appellant, which Dustin then forwarded to the police. Alerted to the reported crime, the police searched Gilston Park and discovered, under a mound of leaves, the badly decomposing body of Carlita Coleman. An autopsy identified her cause of death as

7

homicide due to asphyxia. There were four areas of hemorrhaging in Carlita's neck muscles. The appellant was arrested uneventfully and was at first housed at the Baltimore County Detention Center.

### The Eumenides

Distressed though he may have been at having been incautiously candid with Dustin Archibald, the appellant nonetheless incorrigibly lapsed into precisely the same compulsive garrulity at the County Detention Center. One fellow inmate was Jeffrey Holemo, who was a cellmate for several days. The report of the crime that the appellant recounted to Holemo, in the presence of another prisoner, Keaton Holliday, was far more lurid than had been the more truncated version earlier given to Dustin Archibald. The appellant told his fellow inmates that as the party of October 15 was breaking up, he and Carlita had committed themselves to additional sexual interaction. They needed only a convenient venue. They could not go to her house nor to his, however, because of the presence of their respective parents.

> [S]o they went into the woods at the park there. And when they went into the woods they began, you know, like he said, they were making out and messing around and at some point she started to fight, try to fight him off and said that she was grabbing his throat. And he specifically showed like this. And then in order to stop her from scratching at his throat he said that he had to choke her for two to three minutes until she stopped flailing her arms. He said that once they, once he had, once she stopped flailing at him, once she stopped scratching him and he let her go he said he realized that she wasn't moving. So, he checked her pulse and found none. So, on the spur of the moment he said he dragged her off of the path in the woods and lightly covered her. He even made a point then of saying he didn't cover her that well and he was worried about it. So, over the next several days, several weeks he came back checking on her.

(Emphasis supplied).

8

The appellant further indicated that the sudden contretemps between him and Carlita flared up because she, at the last minute, decided not to engage in sexual intercourse or, more likely, to discontinue sexual intercourse that had once begun, either mode of disengagement to his evident displeasure. The unexpected sexual détente did not go well. In the appellant's very words to Jeffrey Holemo, at some point in the unexpected disengagement, "she . . . tr[ied] to fight [me] off."

> [PROSECUTOR]: Okay. Did the defendant, <u>what if anything did the defendant say about sexual intercourse?</u>
>
> MR. HOLEMO: He said that <u>they had gotten started having sex</u> and then she at some point, that was – <u>They had started having sex and then she decided to stop.</u> And <u>that's when she started clawing at his throat.</u>
>
> [PROSECUTOR]: Did the defendant, what if anything did the defendant tell you about whether he ejaculated?
>
> MR. HOLEMO: He said he didn't have a chance. It was too cold <u>and she started fighting back.</u>
>
> [PROSECUTOR]: <u>Did he</u> say, <u>tell you how that made him feel?</u>
>
> MR. HOLEMO: Well, he just – not specifically. <u>He said that</u>, all right, you know, <u>it pissed him off. Any guy who has to stop will tell you that, that it's a little aggravating</u>[.]

(Emphasis supplied). But in that moment of "aggravation," what then ensued?

More vaguely and more ambiguously, Keaton Holliday essentially confirmed the testimony of Jeffrey Holemo about the appellant's description of his crime. A wrinkle of difference between the two was that Holliday referred to the appellant's having hit Carlita with an "uppercut" and having strangled her per a "chokehold."

9

MR. HOLLIDAY: I don't know the exact time. He told me she scratched him. <u>He uppercut her. He put her in a choke-hold until she gargled and her arms went limp and she died.</u> That's what he told.

(Emphasis supplied).

Holemo also described a recurring dream that appellant had been having, one that shed eerie light on the appellant's inner revulsion.

And he mentioned (laughs) – <u>a particular dream where he was involved with a woman</u> and out of nowhere when he leaned in, I believe he said <u>when he leaned in to kiss her, maggots started coming out of her mouth and out of her face.</u> And just in light of what he had told me it's just that – (laughs) – <u>it struck a note.</u>

(Emphasis supplied). What might Dr. Freud have done with that? Or Alfred Hitchcock?

## Some Nuances Of Self-Defense

Although neither of the contentions now before us involves the appellant's almost Pavlovian claim of self-defense, that issue was still being hotly contested as the case went to the jury. In closing argument, defense counsel enjoined the jury:

I know <u>you got the Jury Instructions in terms of self-defense, complete self-defense and imperfect self-defense.</u> I'm not gonna go through all of the aspects of it. And <u>you will</u> have those to <u>be able to go through each one of them.</u>

(Emphasis supplied).

According to defense counsel, the jury was free both to infer that the appellant believed "he was under attack from her" and to infer that he had "concern for his safety":

He believed that he was trying to restrain her and only restrain her. Now, is that belief reasonable? That's for you to decide. <u>Is his belief that he was under attack from her and had the concern for his safety</u>, is that reasonable? Again, that's for you to decide.

(Emphasis supplied).

10

What vexing problems might this scenario have boded for the evolving law of self-defense if self-defense were somehow a contention in this case? It is not. In the awkward context of coitus interruptus, what behavior, if any, might qualify one as an initial aggressor? When the consensual turns to the non-consensual, roles may change quickly and diametrically. Might refusing to be interrupted when asked to desist qualify one as the aggressor? In this highly particularized setting, might a punch in the nose, moreover, serve as the non-verbal equivalent of "Stop!"? What, indeed, might be the duty to retreat, to wit, to withdraw from the situs of contention, if a path away from danger were safely available? See Redcross v. State, 121 Md. App. 320, 328–34, 708 A.2d 1154, cert. denied, 350 Md. 488, 713 A.2d 980 (1998). Might a chokehold, moreover, escalate a non-lethal exchange (a punch in the nose or a scratch of the neck) to the deadly level?

We pose these inquiries into some of the less explored corners of self-defense law as questions that a more prudent appellant should have asked himself before glibly and simplistically asserting that it was he who was the victim of an unprovoked attack. The answers to the questions, moreover, are not in doubt and they are squarely adverse to the appellant's egocentric view of his encounter with Carlita Coleman. State v. Baby, 404 Md. 220, 260–65, 946 A.2d 463 (2008), holds unequivocally that if a man and a woman are engaged in consensual sexual intercourse and the woman signals that she wants the intercourse to stop, the consensual nature of the encounter is at an end and the man must accordingly desist. Should he fail to do so, his role is thereby transformed into one of being not simply the aggressor but into one of being an actual rapist. 404 Md. at 260 ("[W]e hold that a woman may withdraw consent for vaginal intercourse after penetration has occurred

11

and that, after consent has been withdrawn, the continuation of vaginal intercourse by force or the threat of force may constitute rape.").

Quite aside from the context of rape law, when looking at the severe intoxication that might erode a specific intent even if it would not erode a general intent, would the application of force in self-defense, perfect or imperfect, entail a <u>specific intent</u> to defend oneself against a perceived threat of death or serious bodily harm? More of a two-step mental process is there involved than merely executing an immediate physical action. It is the application of force in order to achieve a conscious purpose. Does self-defense, therefore, involve a specific intent? Does even imperfect self-defense require a specific intent? This possible interplay between voluntary but severe intoxication, on the one hand, and the specific intent that may be inherent in certain criminal defenses, on the other hand, is an issue of first impression that has never been explored in the Maryland caselaw. These are by no means easy questions. One does not prove self-defense merely by asserting self-defense. Might, therefore, a claim of specifically intended self-defense or defense of others or defense of habitation be precluded by voluntary intoxication so severe as to preclude the formation of a specific intent? Simply in terms of the ability to form a specific intent, is there any meaningful difference between the specific intent to harm another and the specific intent to defend oneself? Logically, they appear to be quite similar.

The appellant promiscuously injected all sorts of suggestions of self-defense into jury argument. It may not have been formally argued in the case, but it nonetheless was in the case. Mercifully, we are spared such convoluted analyses by formal appellate

contentions that are far less perplexing. A full examination of the law of self-defense in this very unusual and awkward context must await another day.

### The Standing Epithet "Unfair" Delimits The Noun "Prejudice": A Close Look At Rule 5–403

In his first contention, to wit, that Judge Jakubowski's admission into evidence of the Facebook photograph first used by the police to identify him was erroneously prejudicial, the appellant invokes Maryland Rule of Procedure 5–403:

> Although relevant, <u>evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice</u>, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

(Emphasis supplied). Before addressing this contention specifically, it behooves us to look first to the controlling standard of appellate review when applying Rule 5–403.

Maryland Rule 5–403 was adopted by the Court of Appeals on December 15, 1993, and became effective on July 1, 1994. It was derived from Federal Rule of Evidence 403, and was verbatim with the federal rule at that time. The Rule builds on the undergirding premise that all relevant evidence is admissible. It then recognizes a limited exception to that general admissibility for, <u>inter alia</u>, circumstances where the risk of "unfair prejudice" may "substantially" outweigh the probative value of the relevant evidence. The very wording of Rule 5–403 carefully adjusts the allocation of the burden of proof, the characteristics of the evidence that will be subjected to the weighing process, and the requirement that the weighing produce a "substantial" tilt toward "unfair prejudice" in order to justify inadmissibility.

The rule's frequently invoked obligation on a trial judge to weigh two competing qualities, however, is so regularly subjected to deliberate, almost reflexive, misinterpretation that it warrants some precautionary comment. Invariably, the defense bar suggests that the trial judge must balance "probative value" against "prejudice." That, of course, is not the case. What has been omitted, inadvertently or advertently, in such a formulation is the critical qualifier "unfair." What sits in the defense pan of the balance scale is not naked or general "prejudice" but only a small fraction of that much larger phenomenon. What must be balanced against "probative value" is not "prejudice" but, as expressly stated by Rule 5–403, only "unfair prejudice." This Court went to great lengths to stress that critical distinction in Oesby v. State, 142 Md. App. 144, 165–66, 788 A.2d 662, cert. denied, 369 Md. 181, 798 A.2d 553 (2002):

> The ill effect that militates against admissibility is not prejudice generally, but only unfair prejudice. In a larger sense, all competent and trustworthy evidence offered against a defendant is prejudicial. If it were not, there would be no purpose in offering it.

(Emphasis supplied).

In this context, the noun "prejudice" should never appear without its standing epithet of "unfair."

> To measure probative value against legitimate prejudice would be to measure probative value against itself. In such an exercise in futility, the scales could never tilt in favor of probative value. That obviously is not what the balancing test is designed to do. The "unfair" component of the prejudice is not the tendency of the evidence to prove the identity of the defendant as the perpetrator of the crimes. What is "unfair" is only the incremental tendency of the evidence to prove that the defendant was a "bad man." As we balance, therefore, the emphasis must be not on the noun "prejudice" but on the qualifying, and limiting, adjective "unfair."

14

142 Md. App. at 166 (emphasis supplied).

Professor Lynn McLain, Maryland Evidence (3d ed., 2013), Sect 403.1(b), "Unfair

Prejudice," p. 650, notes the critical distinction between "prejudice" and "unfair prejudice."

> Care must be taken to note that a countervailing consideration under Md. Rule 5–403 with regard to admissibility is not the risk of "prejudice," but "the danger of <u>unfair</u> prejudice." The fact that evidence prejudices one party or the other, in the sense that it hurts that party's case, is not the undesirable prejudice referred to. An eyewitness's testimony that she saw the defendant shoot the victim may well hurt the defendant's chances for an acquittal, but it is not <u>unfairly</u> prejudicial.

(Emphasis in original; footnotes omitted).

Joseph F. Murphy, Jr., Maryland Evidence Handbook (3d ed., 1999), Sect. 506(B),

"Unfairly Prejudicial Evidence," p. 181, wrote to the same effect:

> Coburn [v. Coburn, 342 Md. 244, 674 A.2d 951 (1996)] reminds us that evidence is never excluded merely because it is "prejudicial." <u>If prejudice were the test, no evidence would ever be admitted. The parties have a right to introduce prejudicial evidence.</u> Probative value is outweighed by the danger of "<u>unfair</u>" prejudice when the evidence produces such an emotional response that logic cannot overcome prejudice or sympathy needlessly injected into the case. The line is not always easy to draw.

(Emphasis supplied).

For the process of weighing, the caselaw punctiliously links the noun "prejudice"

with its standing epithet of "unfair." As Judge Nazarian recently wrote for this Court in

Smith v. State, 218 Md. App. 689, 704, 98 A.3d 444 (2014):

> It is not enough, though, for evidence to be relevant. Under Maryland Rule 5–403, the trial court should exclude relevant evidence <u>if the probative value of the evidence "'is substantially outweighed by the danger of unfair prejudice.'"</u>

15

(Emphasis supplied). <u>See also King v. State</u>, 407 Md. 682, 696–707, 967 A.2d 790 (2009); <u>Carter v. State</u>, 374 Md. 693, 705, 824 A.2d 123 (2003); <u>Andrews v. State</u>, 372 Md. 1, 19–20, 811 A.2d 282 (2002).

## Minimalism Is Not Required:
## Need For The Evidence As A Non-Factor

When invoking Rule 5–403, defense lawyers frequently abuse the factor of necessity. The hue and cry is that the State did not need the evidence. If there is actually "unfair prejudice" in the weighing process, the State's <u>need</u> for the evidence may, indeed, be a factor in assessing the probative value of the evidence. The abuse of the necessity factor occurs in cases where the evidence produces no "unfair prejudice" but only "legitimate prejudice." Even in such a case, defense counsel still seek to limit the use of evidence by invoking the necessity principle. There is, however, no such principle protecting defendants from legitimate prejudice. In cases where the resulting prejudice is legitimate rather than "unfair," the fact that the State's case may not, in terms of its sufficiency, desperately need the evidence in question does not diminish in the slightest the weight of the evidence's probative value. As <u>Oesby</u> explained:

> <u>Probative value does not depend on necessity.</u> When we are talking only about the legitimate prejudice that inevitably results from competent evidence enjoying a special or heightened relevance, <u>there is no downside to making a strong case even stronger.</u>
> . . . .
> In terms of legitimate prejudice, . . . <u>the State is not constrained to forego relevant evidence and to risk going to the fact finder with a watered down version of its case.</u>[6]

---

[6] Should the State present ten eyewitnesses against an armed bank robber, the robber

(continued . . . )

142 Md. App. at 166 (emphasis supplied).

The appellant argued strenuously in this case that there was no necessity for the State to have introduced the photograph of the appellant, ostensibly to show his identity, because the defense was not contesting the criminal agency of the appellant as Carlita Coleman's killer. In his brief, appellant argues:

> Throughout Terrence Newman's trial, his defense counsel never disputed that Mr. Newman was responsible for the death of Carlita Coleman. Nor did Mr. Newman's counsel dispute that the police conducted a proper investigation of the evidence. The only issues before the jury related to whether, and to what extent, Mr. Newman possessed the specific intent necessary to be convicted of first-degree murder, and whether he was justified in killing Ms. Coleman on the basis of self-defense. Nevertheless, the State, in an attempt to inflame the jury against Mr. Newman, introduced an intimidating photo of the defendant, under the guise of defending the integrity of its police investigation—which was never in question.

Precisely the same argument was advanced by the defendant in Bedford v. State, 317 Md. 659, 566 A.2d 111 (1989). The Court of Appeals rejected the argument.

> Bedford argues that the admitted photographs were irrelevant to the only issue contested, that of criminal agency. He points out that the pictures did not corroborate or discredit any element of the defendant's or the State's case, and merely established what happened, not who committed the crime. Citing several Pennsylvania and Maine opinions, Bedford alleges that where a photograph has only minimal significance, and no essential evidentiary value, the trial judge should be more inclined to exclude it if it is inflammatory. Nonetheless, we have not adopted such a test and require only that the trial judge not abuse his discretion.

---

( . . . continued)

will not be heard to complain that one witness (or two) would have adequately established his criminal agency and that the use of the additional eight or nine witnesses constituted "unfair prejudice," presumably entitling him to a reversal of his conviction. The fact that the evidence might be unnecessary or redundant will not transform "legitimate prejudice" into "unfair prejudice."

17

317 Md. at 677 (emphasis supplied).

The notion that probative value depends on the State's need for the evidence was also soundly rejected in <u>Johnson v. State</u>, 303 Md. 487, 503, 495 A.2d 1 (1985):

> Johnson further challenges the photographs by contending that the photographs did not illustrate any issue in controversy and that they were cumulative proof of what was already in evidence.
>
> We find this argument unpersuasive. We have previously held that <u>photographs of the deceased are admissible even where the location of injuries was previously described and conceded by the defendant.</u>
> . . . .
> Moreover, <u>all photographic evidence is in some sense cumulative.</u>

(Emphasis supplied). <u>See also State v. Broberg</u>, 342 Md. 544, 554, 677 A.2d 602 (1996) ("We have also noted that <u>photographs do not lack probative value merely because they illustrate a point that is uncontested.</u>" (Emphasis supplied).); <u>Grandison v. State</u>, 305 Md. 685, 730, 506 A.2d 580 (1986) ("Nor are the particular photographs inflammatory to the jury solely on the basis that they do not represent any issue in controversy.").

This Court has consistently recognized that a need for the evidence is not a factor in assessing probative value. In <u>Lucas v. State</u>, 116 Md. App. 559, 573, 698 A.2d 1145, <u>cert. denied</u>, 348 Md. 206, 703 A.2d 148 (1997), we rejected just such an argument as the appellant makes here.

> Appellant presents another reason for excluding the "trophy photographs." <u>He contends that</u>, as the State established that he was a consistent visitor to the Monica Place apartment by introducing his personal papers found there, <u>the "trophy photographs" were unnecessary and redundant, and therefore irrelevant.</u> Again, <u>we disagree.</u>
>
> "[P]hotographs need not possess 'essential evidentiary value' to be admissible."

18

(Emphasis supplied). See also Lovelace v. State, 214 Md. App. 512, 548–49, 78 A.3d 449 (2013) ("[T]he Court of Appeals in Broberg noted that 'photographs may be relevant and possess probative value even though they often illustrate something that has already been presented in testimony.'"); Wagner v. State, 213 Md. App. 419, 453–55, 74 A.3d 765 (2013).

In making arguments that the State has no need for certain evidence, defense counsel frequently focus exclusively on the burden of production and give no thought to the ensuing burden of ultimate persuasion. This Court tried to disabuse counsel of that limited view in Anaweck v. State, 63 Md. App. 239, 246–47, 492 A.2d 658, cert. denied, 304 Md. 296, 498 A.2d 1183 (1985):

> A preliminary word on the subject of relevance! Even if it could be said with certainty that the evidence of December 12, standing alone, would have established a legally sufficient, prima facie case of guilt as to both appellants, that would not dissipate the State's legitimate need for additional relevant evidence. Relevant evidence is necessary not only to meet the threshold burden of production, but also to meet the far greater burden of ultimate persuasion. All evidence beyond that barely minimal amount that represents legal sufficiency will not be deemed redundant. When the State sufficiently satisfies its initial burden of production, its real task is not finished, but only begun.

(Emphasis supplied).

A solid and legitimate case for the prosecution is by no means required to be minimalist. Putting on a strong case is a virtue, not an abuse. In one sense, to be sure, any evidence beyond the satisfaction of the burden of production may not be strictly necessary. It may not be necessary, that is, to prevail on appeal if the issue is the legal sufficiency of the evidence. The additional evidence may, on the other hand, be quite necessary in order

to persuade an unpredictable jury of legally untutored laymen to return a verdict of guilty unanimously and beyond a reasonable doubt. A minimalist case would run a dangerous risk of failing to do that. The defense abuse of this necessity factor is invariably argued in the context of the burden of production and ignores as irrelevant the significantly more imposing burden of ultimate persuasion. But that which satisfies one judge as a prima facie case may well not persuade each of twelve jurors beyond a reasonable doubt.

Necessity, moreover, is only a factor if and when the relevant evidence has some element of unfair prejudice connected to it. Where the relevant evidence is not burdened by unfair and entangling prejudice, necessity is not in any way a factor. A strong case need not apologize for itself.

### Cherchez The Adverb

As we have discussed, the noun "prejudice" must never be allowed to travel immodestly abroad without its adjectival cloak of "unfair." If reliance on the limiting adjective were not enough to keep the weighing process within its prescribed and intended boundaries, however, let us not neglect the potentially dispositive adverb. To justify excluding relevant evidence, the "danger of unfair prejudice" must not simply outweigh "probative value" but must, as expressly directed by Rule 5–403, do so "substantially."[7]

---

[7] Thus, even in a case where, on balance, the "unfair prejudice" outweighs the "probative value," the State's evidence may still be admissible. In cases where the "probative value" has only been outweighed slightly or to a modest extent instead of having been outweighed "substantially," the State's evidence would still be admissible. In sporting terms, the opponent of the relevant evidence must overcome a "substantial" handicap.

20

By its express provisions, Rule 5–403 has steeply tilted the weighing process in favor of admissibility.

The proponent of relevant evidence must never overlook, nor permit the court to overlook, this express adverbial edge. Rule 5–403 itself explicitly places its own heavy thumb on the scale. Propelled by such an adverbial tailwind, the proponent of the challenged evidence should, far more often than not, prevail.

### Appellate Deference As A Critical Decisional Factor

In reviewing the case-by-case application of this weighing exercise, moreover, an appellate court regularly defers to the discretion of the trial judge. In prescribing the deferential abuse-of-discretion standard to our review of a trial judge's rulings on evidentiary questions, this Court in Kelly v. State, 162 Md. App. 122, 143, 873 A.2d 434 (2005), rev'd on other grounds, 392 Md. 511, 898 A.2d 419 (2006), spoke through Judge (now Chief Judge of the Court of Appeals) Barbera:

> We generally defer to the trial court's rulings on the admissibility of evidence, including determinations of relevance, and we do not disturb such rulings in the absence of an abuse of discretion.

(Emphasis supplied). This appellate deference includes deferring to the trial judge on such assessments as which outweighings are "substantial" and which are "less than substantial."

In Oesby v. State as well, we commented on the abuse-of-discretion standard especially in the context of weighing "probative value" against "unfair prejudice" pursuant to Rule 5–403:

> This final balancing between probative value and unfair prejudice is something that is entrusted to the wide discretion of the trial judge. The appellate standard of review, therefore, is the highly deferential abuse-of-

21

discretion standard. The fact that we might have struck the balance otherwise is beside the point. We know of no case where a trial judge was ever held to have abused his discretion in this final weighing process. As a practical matter, that will almost never be held to have occurred. A properly disciplined appellate court will not reverse an exercise of discretion because it thinks the trial judge's decision was wrong. That would be substituting its judgment for that of the trial court, which is inappropriate if not forbidden. Reversal should be reserved for those rare and bizarre exercises of discretion that are, in the judgment of the appellate court, not only wrong but flagrantly and outrageously so. In this case, we see no faint or distant glimmer of even arguable abuse.

142 Md. App. at 167–68 (emphasis supplied). See also Parker v. State, 408 Md. 428, 437, 970 A.2d 320 (2009) ("'When the trial judge's ruling involves a weighing, we apply the more deferential abuse of discretion standard.'"); Dehn v. Edgecombe, 384 Md. 606, 628–29, 865 A.2d 603 (2005); Thomas v. State, 168 Md. App. 682, 713, 899 A.2d 170 (2006), aff'd, 397 Md. 557, 919 A.2d 49 (2007); Malik v. State, 152 Md. App. 305, 324, 831 A.2d 1101, cert. denied, 378 Md. 618, 837 A.2d 929 (2003); North v. North, 102 Md. App. 1, 13–14, 648 A.2d 1025 (1994).

On appellate review, we do not, de novo, make close calls with respect to the exercise of discretion. We approve many discretionary calls that we ourselves might not have made. We reverse only egregiously bad calls as abuses of discretion. From this meticulously limited and deliberately narrow reviewing platform, we now look to Judge Jakubowski's overruling of the appellant's objection to the admissibility of the appellant's photograph based on Rule 5–403. We hold that she did not abuse her discretion.

### The Appellant's Facebook Picture

The argument and the ruling on the admissibility of State's Exhibit 2, a Facebook picture of the appellant, was brief and uneventful. Defense counsel made two arguments.

The first questioned the probative value of the photograph on the ground that it was not needed as evidence because the identity of the appellant as the criminal agent was not disputed.

> So, <u>my client's identity is not in question here. The identity of the</u>, of the <u>suspect in this case</u>, in this case <u>is not in dispute.</u>
> . . . .
> But considering the fact that again, I go back to <u>we're not disputing that my client was the one that was in the woods with the woman.</u> My client's not, you know, we're not disputing any of that fact. So, <u>in the absence of any issue on identification, I don't see how that is anything but duplicative.</u>

(Emphasis supplied).

The second challenge was that the picture is prejudicial because the appellant is "making a muscle."

> [C]ertainly if you look at it, it's prejudicial in the manner in which it's utilized because now <u>you've got my client making a muscle, trying to look tough.</u> And so, I think that there's a potential of it being, having a prejudicial effect.

(Emphasis supplied).

Judge Jakubowski's ruling, admitting the photograph in evidence, was brief and to the point.

> The fact [is] that this particular witness, Mr. Dustin Archibald, sent this to the police after he, he contacted them about Mr. Newman's involvement in this case. <u>I do think it is probative. I do think it's admissible.</u> And <u>I think the probative value outweighs any prejudicial effect that you think</u>, [Defense Attorney], <u>this may have on your client.</u> And I'm going to allow it.

(Emphasis supplied). We affirm that ruling.

### Probative Value

Relevant evidence inherently has probative value. Until alerted by Dustin Archibald, the police had no idea that a crime had even been committed, let alone who committed it. Dustin Archibald supplied both of those vital pieces of information. Although Dustin had known the appellant for several years and may have known both his first and last names, there was no indication that he was necessarily fully alert to "name, rank, and serial number," to wit, to home address, to workplace, to social security number, etc. Under the circumstances, furnishing the police with a Facebook photograph of the appellant was obviously valuable in helping them to establish the identity of the suspect. In this case, moreover, the appellant expressly declines to challenge the relevance of the photograph.[8]

---

[8] The appellant does not raise any challenge pursuant to Maryland Rule 5–402, which provides that "all relevant evidence is admissible" and that "Evidence that is not relevant is not admissible." Is the appellant, therefore, being incongruous when he argues in his appellate brief, page 13, that "the photo lacked any probative value?" We think not.

In looking at the full context of the appellant's argument, it is indisputably clear that the appellant's challenge to "probative value" is not a challenge to the relevance of the evidence. The appellant returns to his attack on "probative value" a dozen times, and on each occasion the unmistakable thrust of the attack is exclusively on the State's need for the evidence. The identity of the defendant at the trial table with the criminal agent whose actions the witnesses are describing is, by definition, relevant.

The State's strategic or tactical need for any item of identifying evidence is an entirely different matter, which we have discussed at length <u>supra</u> under the subhead "Need For The Evidence As A Non-Factor." The appellant treats "probative value" as synonymous with "need." The appellant makes no mention of "relevance." The appellant is not arguing that "the evidence is not relevant." He is arguing that "the State already has more than enough relevant evidence and does not need any more." That is not a Rule 5–402 challenge.

Access to the Facebook picture of the appellant, moreover, corroborated the fact that there was a close and long-standing relationship between the appellant and at least two members of the Archibald family.

Even in a case where the defendant might not be challenging the establishment of his identity, it would still be incumbent on the State to prove the identity of the defendant and to establish his criminal agency. As we have already fully discussed, the fact that any particular item of evidence might not have been indispensable for that purpose would not in any way diminish or erode its probative value. The State is not required to take a minimalist approach.

## The Absence Of Any Unfair Prejudice

We have examined closely State's Exhibit 2 and do not find it in any way to be "intimidating" or otherwise redolent of any unfair prejudice. That, of course, is not our job. More pertinently, we cannot, therefore, hold that Judge Jakubowski abused her discretion in not finding unfair prejudice. That, of course, was her job.

The picture is an 8" by 10" photograph of the upper body of the appellant. He is looking straight at the camera and is wearing a shirt. He is, indeed, flexing his right bicep, but in no way does he come across as some sort of grotesque body builder. The strong upper body musculature shown in the picture simply reflected the robustly healthy young man in his early 20's, who was 6'2" tall and weighed 200 pounds, who sat at the trial table in front of the jurors for four full days of trial. It is a good picture and, moreover, a pleasant one. The appellant exhibits no anger or menace. He is not, as his counsel suggests, "intimidating." If anything, he is barely suppressing a wry smile, à la Mona Lisa. The

25

appellant does not suggest any way in which the picture of him would rouse or stir the emotions of the jurors against him. The appellant utterly fails to identify what aspect of his defense might have been adversely affected by the photograph.

When a defendant does not testify, moreover; does not offer any witness or other evidence in his defense; and does not so much as give a statement to the police, it difficult to discern exactly what, if anything, his defense is. It is a bit of a guessing game. Without any unfair prejudice, of course, the rest of Rule 5–403's analytic framework collapses.

### Arca v. State And Banks v. State

In making his argument that the "unfair prejudice" in this case "substantially" outweighed any possible "probative value," the appellant relies exclusively and heavily on Arca v. State, 71 Md. App. 102, 523 A.2d 1064, cert. denied, 310 Md. 276, 528 A.2d 1287 (1987), and Banks v. State, 84 Md. App. 582, 581 A.2d 439 (1990). It behooves us, therefore, to give them at least brief mention.

At the outset, of course, it should be noted that those cases were decided, in 1987 and in 1990, at a time before Rule 5–403 had yet been adopted by the Court of Appeals in 1993. That chronology, however, is not so deflating of Arca and Banks as might at first glance seem to be the case. Both Maryland Rule 5–403 and Federal Rule 403, on which the Maryland Rule was based, were simply codifications of pre-existing common law. Arguments that resonate in the language of Rule 5–403, therefore, are not at all inopportune even if made before Rule 5–403 was promulgated.

Even thus rescued from anachronism, however, Arca and Banks are still not remotely apposite to the present case. In both Arca and Banks, the police introduced a

26

photograph of the defendant for identification purposes. In each of those two cases, however, the photograph had some additional content that raised the possible implication that the defendant was more likely to have committed the crime than would have been the case if the photograph had never been shown. There was thus an additional or contaminating factor that transformed "legitimate prejudice" into "unfair prejudice."

What was involved in <u>Arca</u> was a "mug shot" of the defendant. The trial court initially made an effort to sanitize the "mug shot."

> At the court's direction, Xerox copies of the photographs, with the chestplate containing identification numbers covered over, were made and were given to the jury in substitution for the actual photographs.

71 Md. App. at 104.

The Court of Special Appeals nonetheless concluded that what was introduced was "obviously a police 'mug shot' of appellant." <u>Id</u>. Judge Wilner's opinion further explained:

> Notwithstanding the court's effort to ameliorate the prejudicial effect of the photographs, <u>the implication that appellant had prior police contact remained strong.</u>
> . . . .
> [T]hough "doctored," <u>the photographs still showed the front and profile view commonly associated with police "mug shots."</u>

71 Md. App. at 106 (emphasis supplied).

The <u>Arca</u> opinion explained that the prejudicial damage done by a "mug shot" is to convey to the jury the likelihood that the defendant has a prior criminal record and may be "consequently a bad person."

> With the defense being self-defense, the jury's decision could well have been influenced by <u>the thought that appellant had a prior record and was consequently a bad person.</u>

27

<u>Id</u>. (Emphasis supplied).

The opinion had earlier explained that police photographs:

> also have <u>the potential for undue prejudice</u> by alerting the jury to <u>the distinct possibility that the defendant has a prior police record</u>, thereby taking on <u>a form of prohibited "other crimes" evidence.</u>

71 Md. App. at 105 (emphasis supplied).[9]

The photograph of the appellant in the present case raised no such inference and did not thereby constitute "unfair prejudice."

In <u>Banks</u>, the gratuitously contaminating little "extra" was a gun. <u>Banks</u> actually involved two identifying photographs, in each of which Banks was sporting a gun. The opinion for this Court by Judge (later Chief Judge of the Court of Appeals) Bell described the two photographs.

> In one of the photographs <u>the man is holding a small handgun in the palm of his right hand</u> and, <u>while looking at it with what may be described as admiration, pointing to it with his left.</u> In the other, <u>the man is holding the gun, in his right hand, in an offensive manner, pointed upward, with his left hand on his hip.</u> In both photographs, the man's shirt is half-in and half-out of his trousers.

84 Md. App. at 585 n.2 (emphasis supplied).

In <u>Banks</u>, the crime for which the defendant was convicted was the distribution of cocaine. Judge Bell's opinion explained why, especially in such a case, placing a gun in the hand of the defendant was so potentially damaging.

---

[9] In contrast to <u>Arca</u>, see <u>Straughn v. State</u>, 297 Md. 329, 465 A.2d 1166 (1983), which also involved a police "mug shot." In <u>Straughn</u>, however, the "unfair prejudice" generated by the "mug shot" did not outweigh "probative value" and the conviction was affirmed. In <u>Straughn</u> the State's need for the evidence was greater than in <u>Arca</u> and, accordingly, the "probative value" was weightier.

> Possession and, indeed, <u>use of weapons</u>, most notably, firearms, <u>is commonly</u>
> <u>associated with the drug culture; one who is involved in distribution of</u>
> <u>narcotics</u>, it is thought, <u>a fortiori,</u> <u>would be more prone to possess</u>, and/or use,
> <u>firearms</u>, or other weapons, <u>than a person not so involved.</u>

84 Md. App. at 591 (emphasis supplied).

The "unfair prejudice" indisputably generated by the "mug shot" in <u>Arca</u> and by the gun in <u>Banks</u> clearly had to be weighed against "probative value" before the challenged photographs could be deemed either admissible or inadmissible in evidence. In this case, by contrast, there was no "unfair prejudice" and the weighing process did not even come into play. Neither <u>Arca</u> nor <u>Banks</u> turns us aside from our affirmance of Judge Jakubowski's ruling.[10]

**A Jury Instruction On Voluntary Intoxication**

The appellant's second contention is that Judge Jakubowski erroneously gave to the jury, at the State's request, an instruction on voluntary intoxication that had not been generated by the evidence. In <u>Gimble v. State</u>, 198 Md. App. 610, 627, 18 A.3d 955, <u>cert.</u> <u>denied</u>, 421 Md. 193, 25 A.3d 1026 (2011), Judge Deborah Eyler set out our framework for review of whether a trial judge was in error for giving, or for failing to give, a requested jury instruction.

> <u>On review</u> of a trial court's ruling granting or declining a proposed
> jury instruction, <u>we consider whether the instruction was generated by the</u>
> <u>evidence, whether it was a correct statement of law</u>, and whether it otherwise
> was fairly covered by the instructions actually given.

---

[10] The grisly pictures of the decomposing body of Carlita Coleman would seem to have been a more likely candidate for a Rule 5–403 challenge than the Facebook photo of the appellant. Not necessarily a successful candidate, <u>see Johnson v. State</u>, 303 Md. 487, 503, 495 A.2d 1 (1985); <u>Roebuck v. State</u>, 148 Md. App. 563, 813 A.2d 342 (2002), <u>cert.</u> <u>denied</u>, 374 Md. 84, 821 A.2d 371 (2003), but at least a more promising candidate.

29

(Emphasis supplied).

Because the contention now before us is one involving the affirmative giving of an instruction rather than the failure to give an instruction, <u>Gimble</u>'s third inquiry is inapposite.

## The Instruction Was Correct

It is, of course, necessary that when the jury is instructed about a legal principle that that instruction be correct. In this case, Judge Jakubowski first instructed the jury about the fundamental proposition that generally voluntary intoxication does not excuse or justify criminal conduct. She then went on to amplify that basic law with its limited exception as she further explained the exonerating or at least extenuating effect that severe voluntary intoxication can have on a specific intent crime.

> You've also heard evidence that the defendant acted while intoxicated by alcohol. You must now consider his mental state at the time of the act that caused the death. <u>Generally voluntary intoxication is not a defense and does not excuse or justify criminal conduct. However, when charged with an offense requiring a specific intent, the defendant cannot be guilty if he was so intoxicated at the time of the act that he was unable to form the necessary specific intent.</u> A specific intent is a state of mind in which the defendant intends that his act will cause a specific result. In this case, the defendant is charged with first-degree and second-degree murder of Carlita Coleman. <u>Both of these offenses require evidence of specific intent to murder. If the defendant was so intoxicated at the time of the act causing the death that he was unable to form the necessary specific intent then you cannot find the defendant guilty of any specific intent variety of murder.</u> In order to convict the defendant of a specific intent murder, the State must prove beyond a reasonable doubt that the degree of intoxication did not prevent the defendant from forming specific intent.

(Emphasis supplied).

The instruction then went on to explain that voluntary intoxication, no matter how severe, is no defense to a crime requiring a mere general intent. Both depraved heart murder and involuntary manslaughter of the gross criminal negligence variety are mere general intent crimes on which voluntary intoxication would have no erosive effect. See Cirincione v. State, 75 Md. App. 166, 171 n.1, 540 A.2d 1151, cert. denied, 313 Md. 611, 547 A.2d 188 (1988).

> If you find the defendant guilty of specific intent murder do not address what I'm going to talk to you about next, which is depraved heart murder or involuntary manslaughter. If on the other hand, in light of the defendant's intoxication, the State did not prove beyond a reasonable doubt that the defendant had the necessary specific intent when he did act, then you go on to consider depraved heart murder, which is the next instruction. So, the defendant is also charged with second-degree depraved heart murder. Second-degree depraved heart murder is the killing another person while acting with an extreme disregard for human life. Voluntary intoxication is not a defense to second-degree depraved heart murder because that variety of murder does not require specific intent.

(Emphasis supplied).

We carry coals to Newcastle in noting that the instruction was eminently correct. The appellant does not even challenge its correctness.

### The Evidence Generated The Instruction

The second prerequisite is that the jury instruction in issue shall have been generated by the evidence. In this case, the evidence to support the intoxication instruction was abundant. Early in the afternoon of October 15, the appellant was one of three persons who consumed a water bottle filled with vodka. The same threesome, shortly thereafter, drank half a bottle of wine. The appellant and Carlita finished the major part of another gallon of vodka. Dustin Archibald described the appellant as "under the influence" when Dustin left

31

the park. Reba Archibald described both the appellant and Carlita as being "both flat out drunk." The appellant later told Dustin Archibald that he "blacked out" during the fight with Carlita. He also told Keaton Holliday that he "blacked out" when Carlita hit him and he put her in a chokehold and that he "didn't come back through until her arms stopped shaking."

In closing argument, moreover, defense counsel reminded the jurors, in lurid detail, of how much the appellant had had to drink. He admonished them to consider the extent to which the appellant's judgment was inevitably clouded by alcohol, clouded to the point of relieving him of criminal responsibility. This was the very heart of the defense case. It was imperative that the jury be informed as to the legal effect of voluntary intoxication, at any level, on the criminal responsibility of the appellant. The evidence overwhelmingly generated the instruction. This was in no sense a close call.

### Voluntary Intoxication And Specific Intent

In terms of the pertinence of the instruction on the legal effect of voluntary intoxication, that pertinence may be found at two different levels, a highly nuanced level and a far more fundamental level. We will look first at the more nuanced level.

The jurors in this case, as factfinders, had few disputed facts to find. Carlita Coleman was dead as a result of having been strangled by the appellant. There was no issue as to "Who dunnit?" The only issue for factfinding that might have had an influence on the ultimate verdict was that of "Why he dunnit?" A guilty verdict as to some variety of criminal homicide was a foregone conclusion. In the labyrinth of almost a dozen different

kinds and degrees of criminal homicide, however, where would the critical <u>mens rea</u> of the appellant be found to have been?

On the facts of the case, moreover, the State was indisputably entitled to the benefit of the instruction. It was entirely conceivable that the appellant's state of voluntary intoxication was so extreme that the jury could readily have found that he was incapable of forming a specific intent. Such a finding would have precluded his being convicted of either first-degree or second-degree murder of the specific intent-to-kill variety. It was to protect itself against this possibility that the State included into the charges going to the jury possible convictions of depraved heart second-degree murder and its junior varsity counterpart, involuntary manslaughter of the gross criminal negligence variety. Both of these are mere general intent crimes and no amount of voluntary intoxication could preclude convictions for them.

From the State's point of view, therefore, the facts of this case made the instruction on the critically different impacts that voluntary intoxication might have on a defendant's specific intent and on his general intent absolutely essential. It could save second-degree murder on the depraved heart theory even if it lost both first-degree murder and second-degree murder on the specific-intent-to-kill theory. The State was entitled to the instruction.

## Voluntary Intoxication Generally

Let us now move the voluntary intoxication issue out of the stratosphere and down to earth. Long before we even get to the arguably arcane distinction between specific intent and general intent, the instructing of the jury on the legal effect of voluntary intoxication was critically important at a far more fundamental level. Throughout the trial and then

33

relentlessly in closing argument, the consistent defense thesis was that the appellant was too intoxicated to be criminally responsible for his actions and that his killing of Carlita Coleman was somehow an unfortunate accident. A legally untrained jury could well have accepted such an erroneous but seemingly plausible argument. Defense counsel was certainly urging it to do so. At times in closing argument to the jury, defense counsel seemed to be suggesting that the appellant was, indeed, in a very compromised mental condition because of excessive drinking.

> But then <u>when you start talking about a half-gallon of vodka, drunken sex</u>, someone acting out, any response to that it gets, it's not an easy thing to have to do.
> . . . .
> Now, we're assuming that <u>my client who has a half-gallon of vodka after a bottle of vodka, after a half-bottle of wine</u> can say definitively how much time. Because perception of time I think we all would agree that <u>when you've been drinking is a little bit off.</u>

(Emphasis supplied). The appellant was clearly asking the jury to consider his severe intoxication.

The controlling law, however, is 180° otherwise. Long before getting to the point where severe voluntary intoxication may preclude the forming of specific (but not general) intent, the much older and more basic principle of law is that voluntary intoxication is no excuse. A voluntarily intoxicated individual is as fully responsible for his criminal actions as is a person who is completely sober. <u>State v. Gover</u>, 267 Md. 602, 606, 298 A.2d 378 (1973).

A jury, quite obviously, needs to know of this basic precept, especially where defense counsel is encouraging it to take the opposite approach. An adequately instructed

jury would never buy the theory urged upon it by the defense. An untutored jury might. The defense contention now would seem to be that the jury should have been left in ignorance of the highly relevant and controlling law of voluntary intoxication. Unaware that voluntary intoxication is no excuse for criminal behavior, an unguided jury could have set this appellant free and dismissed the death of Carlita Coleman as an unfortunate accident. There is, however, no due process right to an unenlightened jury.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY THE APPELLANT.**